## HARVEY I. POLLOCK ET AL. *v.* MANOHAR MURLIDHAR PANJABI ET AL.

Superior Court                                    File No. CV970402199S

Judicial District of New Haven

Memorandum filed May 17, 2000

*Thomas P. Willcutts & Associates*, for the plaintiffs.

*Delaney, Zemetis, Donahue, Durham & Noonan*, for the defendants

## I

## INTRODUCTION

LEVIN, J. The issue before the court on the defendants' motion to strike is one of first impression in

Connecticut: Does witness immunity bar a claim brought by an attorney or his client against an expert witness for failing to provide competent litigation support services? Under the facts alleged in the complaint, the court answers this question in the negative. The defendants' motion to strike is, therefore, denied.

The plaintiffs are Melvin Green and his attorney in a foreign action, Harvey I. Pollock, a Canadian lawyer. Attorney Pollock represented Green in a Canadian personal injury action against officers of the Winnipeg, Manitoba police department for permanent and physically debilitating injuries Green received during an arrest. Specifically, on May 1, 1992, officers Jeffrey Lawrence and Conrad Leschied arrested Green for allegedly assaulting his former girlfriend. Lawrence placed Green in a "full nelson" wrestling hold.[1] Green claimed that Lawrence's full nelson hold fractured his neck and rendered him a quadriplegic. On May 28, 1992, Pollock filed a lawsuit on Green's behalf in the Court of Queen's Bench of Manitoba, Canada against Lawrence, Leschied and others. In the lawsuit, Green alleged that Lawrence had employed excessive force during the arrest in restraining Green and sought money damages for Green's injury. In defense, Lawrence alleged that Green had caused his own injury by thrusting his legs backwards against Lawrence. To support his defense, Lawrence disclosed expert reports and computer generated animation.

In preparation for trial, Pollock retained the services of the named defendant, Manohar Murlidhar Panjabi, a professor at Yale University (Yale), as a spinal biomechanics expert. Panjabi was hired to design and conduct experiments to demonstrate how Green's neck

---

[1] A "full nelson" is "a wrestling hold in which both arms are thrust under the corresponding arms of an opponent and the hands clasped behind the opponent's head." Webster's Ninth New Collegiate Dictionary (1991).

injury and quadriplegia were caused by the officer's full nelson hold. Pollock agreed to pay Panjabi $400 per hour, plus travel and accommodation expenses, and Panjabi agreed that (a) he would prepare a report of his findings and conclusions and appear in court to communicate his expert opinion, (b) he would determine and explain the mechanism of Green's injuries using the science of spinal biomechanics with the skill, due care and diligence expected of a "world-class spinal bio-mechanic," (c) any experiment he would use for the purpose of confirming his theory as to the biomechanics of Green's injury and the results achieved thereof could be replicated by other scientists and would be defensible among his scientific peers, (d) he would ensure that all equipment he used in the gathering of data was fit for its intended purpose and that the data generated thereby was reliable, and (e) he would adhere to the scientific process and methodology acceptable within the scientific community. The complaint alleges that Green is an intended beneficiary of this agreement.

Panjabi chose to employ the defendant Jacek Cholewicki, a kinesiologist,[2] to assist him in completing the undertaking. Cholewicki is also a professor at Yale. Panjabi and Cholewicki allegedly used Yale's facilities, equipment and personnel to conduct the experiments to recreate the forces exerted on Green when Lawrence placed him in the full nelson hold. Pollock allegedly paid Yale $2000 by check made out to "Bio-mechanics Laboratory/Dr. Panjabi" for the use of Yale's laboratory, equipment and personnel. Based on the data produced from these experiments, Panjabi provided Pollock and Green with reports that concluded that Lawrence had unilaterally caused Green's injuries. Pollock and Green provided these reports to Lawrence's solicitors.

---

[2] Kinesiology is "the study of the principles of mechanics and anatomy in relation to human movement." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993).

Judge Alan Macinnes of the Court of Queen's Bench of Manitoba granted the request by Lawrence's solicitor for pretrial voir dire of Panjabi. As a result of this questioning, it was discovered that the load cell Panjabi and Cholewicki had used in their experiment was defective.[3] Accordingly, Judge Macinnes ruled that Panjabi's expert opinion was not credible evidence and, therefore, not admissible at trial.

To remedy the unfavorable ruling, Pollock requested a continuance of the trial to permit Panjabi to conduct another experiment using an accurately functioning load cell. Judge Macinnes granted the request on the conditions that (1) the original experiment be exactly replicated and any subsequent testimony of Panjabi be confined to the new results, and (2) before Panjabi's testimony would be admissible at trial, it would have to be established that the load cell in Panjabi's original experiment actually had been defective.

Panjabi conducted the second experiment with a "corrected" load cell and provided Pollock with a new report. Panjabi, however, refused to testify in court unless he was paid $13,050. To protect Green's interests, Pollock paid Panjabi the additional money. Panjabi appeared in court and underwent voir dire a second time. At the conclusion of the second voir dire, Judge Macinnes again disallowed Panjabi's testimony because he had not followed the scientific methodology of the original experiment. The court awarded costs against Green in the amount of $9200 (Canadian dollars)

Judge Macinnes granted Pollock's request for a second continuance to allow Panjabi another opportunity

---

[3] "In electronic scales that use a load cell, the applied weight compresses a column. Bonded to the surface of the column is a strain gauge, a fine wire that undergoes a change in electrical resistance when it is either stretched or compressed. A measurement of this change in resistance yields a measure of the applied weight." http://www.comptons.com/encyclopedia/weighing machines.

to conduct the experiment again. Panjabi did so and provided Pollock with a new report, which Pollock disclosed to Lawrence's solicitors. A defense expert then issued a report opining that Panjabi had again deviated from scientific methodology in conducting the original experiment a second time. A third continuance was granted, with the court advising counsel that the issue of costs would be addressed at the conclusion of the trial.

Panjabi again refused to appear in court unless he was paid additional money. Pollock again paid Panjabi the demanded money. Panjabi and Cholewicki then provided Pollock with another report. For a third time, Panjabi appeared in court and underwent voir dire. At the conclusion of the third and last voir dire, Judge Macinnes again ruled that Panjabi's experiments were incorrectly performed and that his reports would be inadmissible at trial.[4]

Pollock and Green subsequently filed the present lawsuit against Panjabi, Cholewicki and Yale, claiming that the plaintiffs were damaged because of the manner in which Panjabi and Cholewicki rendered their services. In the first count of their revised complaint, Pollock and Green allege that Panjabi breached his contract with Pollock by, inter alia, failing to perform the contractual undertakings involving the load cell experiment. The second count alleges that the negligence of Panjabi and Cholewicki caused damages to Green and Pollock. In the third count, the plaintiffs allege that the acts and omissions of Panjabi and Cholewicki were unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of the Connecticut

---

[4] While it is not a matter of record for purposes of the present motion, it is not undisputed that Green prevailed on the liability portion of his action. His recovery of damages was not diminished by any comparative or contributory negligence. In a careful and comprehensive decision, Judge Macinnes held that Lawrence had employed excessive force against Green and that such force, and not any action of Green, had caused Green's injury.

Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The second and third counts also allege that Yale is vicariously liable based on the doctrine of respondeat superior. The defendants have moved to strike all three counts of the revised complaint.

## II

"The purpose of a motion to strike is to contest . . . the legal sufficiency of the allegations of any complaint . . . to state a claim upon which relief can be granted. In ruling on a motion to strike, the court is limited to the facts alleged in the complaint. The court must construe the facts in the complaint most favorably to the [nonmoving party]. . . . A motion to strike is properly granted if the complaint alleges mere conclusions of law that are unsupported by the facts alleged." (Citation omitted; internal quotation marks omitted.) *Novametrix Medical Systems, Inc.* v. *BOC Group, Inc.*, 224 Conn. 210, 214–15, 618 A.2d 25 (1992). "A motion to strike admits all facts well pleaded." *Parsons* v. *United Technologies Corp.*, 243 Conn. 66, 68, 700 A.2d 655 (1997). The trial court, in ruling on a motion to strike, may consider only those grounds raised in the motion. See *Blancato* v. *Feldspar Corp.*, 203 Conn. 34, 44, 522 A.2d 1235 (1987). "[A] trial court must take the facts to be those alleged in the complaint . . . and cannot be aided by the assumption of any facts not therein alleged." (Citations omitted; internal quotation marks omitted.) *Liljedahl Bros., Inc.* v. *Grigsby*, 215 Conn. 345, 348, 576 A.2d 149 (1990). "The allegations are entitled to the same favorable construction as a trier would be required to give in admitting evidence under them . . . and if facts provable under the allegations would support a defense or a cause of action, the demurrer [motion to strike] must fail." (Citation omitted; internal quotation marks omitted.) *Ferryman* v. *Groton*, 212 Conn. 138, 142, 561 A.2d 432 (1989).

### III

The defendants argue that this action may not be maintained because Panjabi and Cholewicki are protected by the doctrine of witness immunity. The plaintiff argues that witness immunity is inapplicable to the facts of the present case.

"It has long been established that there is an absolute privilege for statements made in judicial proceedings. See *Briscoe* v. *LaHue*, 460 U.S. 325, 331–32, 103 S. Ct. 1108, 75 L. Ed. 2d 96 (1983); *Blakeslee & Sons* v. *Carroll*, 64 Conn. 223, 232, 29 A. 473 (1894) [overruled in part on other grounds, *DeLaurentis* v. *New Haven*, 220 Conn. 225, 263 n.22, 597 A.2d 807 (1991)]. There is a long-standing common law rule that communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject of the controversy. . . . The effect of an absolute privilege is that damages cannot be recovered for a defamatory statement even if it is published falsely and maliciously. . . . The policy underlying the privilege is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements." (Citations omitted; internal quotation marks omitted.) *Petyan* v. *Ellis*, 200 Conn. 243, 245–46, 510 A.2d 1337 (1986) (holding that absolute privilege doctrine, reserved for witnesses in judicial proceedings, protected employer against claims of libel and intentional infliction of emotional distress for statements made by employer on "fact-finding supplement" form provided by employment security division of state labor department).

"The judicial proceeding to which the immunity attaches has not been defined very exactly. It includes any

hearing before a tribunal which performs a judicial function, ex parte or otherwise, and whether the hearing is public or not." (Internal quotation marks omitted.) Id., 246. "The common law absolute privilege itself is not confined to the testimony of a witness but extends to any statement made in the course of a judicial proceeding, whether or not given under oath, so long as it is pertinent to the controversy. . . . Thus it applies to statements made in pleadings or other documents prepared in connection with a court proceeding." (Citation omitted.) Id., 251–52.

In *Kelley* v. *Bonney*, 221 Conn. 549, 552–53, 606 A.2d 693 (1992), the plaintiff, a former public school teacher, sought to recover damages based on claims for defamation, intentional infliction of emotional distress, and breach of contract for alleged defamatory statements contained in a verified petition and complaint filed by the defendant board of education members, as required by the board of education's regulations, concerning alleged inappropriate classroom conduct that led the plaintiff to chose an early retirement. The court found the teacher decertification proceeding before the state board of education to be quasi-judicial in nature and, therefore, the alleged defamatory statements contained in the verified petition and complaint were absolutely privileged. Id., 571. It further held that both the statements made in and any statements made as a requisite step in those proceedings were absolutely privileged. Id. The court cited with approval *Hoover* v. *Van Stone*, 540 F. Sup. 1118, 1123 (D. Del. 1982), which held that "communications . . . made to a limited and discrete group, made in the preparation of [the] plaintiff's case, made for the purpose of obtaining evidence for trial and necessary to engage effectively in the investigation needed to prepare intelligently for trial . . . were absolutely privileged." (Internal quotation marks omitted.) *Kelley* v. *Bonney*, supra, 573; cf. *Irwin* v. *Cohen*, 40

Conn. Sup. 259, 262, 490 A.2d 552 (1985). Nonetheless, the court cautioned that "it is important to consider whether there is a sound public policy reason for permitting the complete freedom of expression that a grant of absolute immunity provides." *Kelley* v. *Bonney,* supra, 567.[5]

"The policy underlying the privilege is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements." (Internal quotation marks omitted.) *Petyan* v. *Ellis,* supra, 200 Conn. 246; see also *Blakeslee & Sons* v. *Carroll,* supra, 64 Conn. 232–33. "Witnesses and parties to judicial proceedings must be permitted to speak freely, without subjecting their statements and intentions to later scrutiny by an indignant jury, if the judicial process is to function. . . . While no civil remedies can guard against lies, the oath and the fear of being charged with perjury are adequate to warrant an absolute privilege for a witness' statements." (Citation omitted.) *DeLaurentis* v. *New Haven,* supra, 220 Conn. 264. Moreover, "[t]o accomplish the purpose of judicial or quasijudicial proceedings, it is obvious that the parties or persons interested must confer and must marshal their evidence for presentation at the hearing. The right of private parties to combine and make presentations to an official meeting and, as a necessary incident

---

[5] The defendants also rely on a Superior Court case, *Bieluch* v. *Dobensky,* Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV940138893S (January 17, 1997) (*Tobin, J.*), in which the plaintiff claimed damages arising from the allegedly false testimony of the defendant in a divorce action between the plaintiff and his ex-wife. The defendant had testified as an expert and had allegedly made false and misleading representations to the court regarding her credentials as an examiner of certain documents and had represented to the court that the signature on a quitclaim deed was a traced forgery when she knew it to be genuine. Id. The court held that the defendant's testimony was absolutely privileged and granted her motion to strike the complaint. Id.

thereto, to prepare materials to be presented is a fundamental adjunct to the right of access to judicial and quasijudicial proceedings. To make such preparations and presentations effective, there must be an open channel of communication between the persons interested and the forum, unchilled by the thought of subsequent judicial action against such participants; provided always, of course, that such preliminary meetings, conduct and activities are directed toward the achievement of the objects of the litigation or other proceedings." (Internal quotation marks omitted.) *Kelley* v. *Bonney*, supra, 221 Conn. 573–74.

These policy reasons undergirding the absolute privilege accorded witnesses are not implicated here. This is not a case in which the right of a witness to speak freely, in or out of court, is involved. While conduct, objects and experiments may have communicative aspects; see, e.g., *Texas* v. *Johnson*, 491 U.S. 397, 404–405, 411–12, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989); *Zauderer* v. *Office of Disciplinary Counsel*, 471 U.S. 626, 647, 105 S. Ct. 2265, 85 L. Ed. 2d 652 (1985); the plaintiffs do not complain about what Panjabi said or about anything Cholewicki, who never testified, said or communicated. Rather, the plaintiffs complain of the defendants' failure to perform work, as agreed upon, according to scientific principles as to which there are no competing schools of thought. This is a case where the defendants performed an experiment that turned out to support the thesis of an opposing party. As *Kelley* v. *Bonney*, supra, 221 Conn. 567, suggests, there must be a nexus between the immunity, the fact-finding function of the court and the interest in having witnesses speak freely. That nexus is not implicated by the allegations of the plaintiffs' complaint.

In most of the cases from other jurisdictions on which the defendants rely; *Giffin* v. *Summerlin*, 78 F.3d 1227 (7th Cir. 1996); *Darragh* v. *Superior Court*, 183 Ariz.

79, 900 P.2d 1215 (1995); *Panitz* v. *Behrend*, 429 Pa. Super. 273, 632 A.2d 562 (1993), allocatur denied, 539 Pa. 694, 653 A.2d 1232 (1994); the truth-seeking function of the courts was implicated by the testimony complained of.[6] Moreover, in *Darragh*, the defendant witness had not assumed any contractual duty to the plaintiff, as the defendants have here.

---

[6] In *Giffin* v. *Summerlin*, supra, 78 F.3d 1227, the underlying action was a medical malpractice action. The plaintiff alleged that his surgeon, the defendant, had agreed before the depositions in the underlying action "to testify only about the surgeries he had performed on [the plaintiff] and not about any possible negligence or malpractice on the part of [the defendant]. [The defendant] did not limit the scope of his deposition testimony, however." Id., 1229. The defendant moved for summary judgment. Id., 1230. On appeal, the Seventh Circuit Court of Appeals affirmed the granting of summary judgment in favor of the defendant on the ground that his deposition testimony, on which the suit was based, was subject to witness immunity. Id., 1230–31.

In *Darragh* v. *Superior Court*, supra, 183 Ariz. 79, the owners of property taken by a city by eminent domain sued the city, certain city employees and the city's appraiser who had testified as to the fair market value of the property. The court held that the appraiser was entitled to witness immunity. The court stated that not only testimony but "reports, consultations, and advice, which are relevant to litigation as preliminary steps in the institution or defense of a case, are a part of the preparation for trial and are therefore within the absolute privilege accorded communications in judicial proceedings." Id., 83. The court, however, let stand a civil RICO action against the appraiser and the city employees who alleged that they had conspired to give false testimony and submit false and fraudulent documents in an attempt to acquire the property at less than fair market value. Id., 83–84.

In *Panitz* v. *Behrend*, supra, 429 Pa. Super. 276, Elaine Panitz, a physician "who regularly offer[ed] her services as an expert medical witness" sued a law firm for failure to pay her fee as an expert witness. The law firm counterclaimed, alleging that Panitz' gross negligence and misrepresentation resulted in an unfavorable verdict. "In the underlying action, the [law] firm had represented the Charney family whose members, allegedly, had been exposed to formaldehyde in building materials and had sustained formaldehyde sensitization reactions. Panitz was employed to support the alleged cause of action. It was expected that she would be cross-examined about the lack of such sensitization in cigarette smokers who regularly are exposed to much greater concentrations of formaldehyde than were the Charneys. In preparation for trial, Panitz provided the [law] firm with a transcript of depositions in a prior case in which she had postulated on the lack of sensitization in cigarette smokers, however, Panitz conceded that she could not explain the apparent inconsistency. After trial, Panitz explained that

*Bruce* v. *Byrne-Stevens & Associates*, 113 Wash. 2d 123, 776 P.2d 666 (1989), on which the defendants also rely, stands on somewhat different footing. In *Bruce*, the plaintiffs sued a neighbor who performed excavation work on his property resulting in less lateral support for the plaintiffs' soil. The plaintiffs retained Byrne-Stevens & Associates to calculate and testify as to the cost of stabilizing the soil on their land. The plaintiffs prevailed and the court awarded the sum calculated by Byrne-Stevens & Associates. The cost of restoring lateral support, however, later proved to be double the amount estimated. The plaintiffs sued Byrne-Stevens & Associates alleging negligence. The court held that the plaintiffs' suit was barred by witness immunity. Id., 138.

*Bruce* was a five to four decision. In a cogent dissent, Justice Pearson wrote: "The question in this case is not whether an expert witness is immune from subsequent suit for defamatory statements made in a court of law. That question is well settled. Rather, today we are asked whether a professional's act of malpractice outside the courtroom is somehow immunized by the subsequent articulation of that negligently formed opinion in a judicial proceeding. Neither the law of absolute immunity nor sound public policy dictates the result reached by the majority. I would hold that a client's action for malpractice is not barred by the defense of absolute immunity merely because the professional subsequently publishes his or her opinion in a court of law . . . ." Id. "[T]he majority extends the rule to shield otherwise actionable professional malpractice." Id. This court finds these observations persuasive.

she had come to realize prior to trial that the reasoning upon which she had relied in earlier depositions was inaccurate." Id., 277. The trial court dismissed the counterclaim and the appellate court affirmed on the basis of witness immunity. See id., 281.

In *LLMD of Michigan, Inc.* v. *Jackson-Cross Co.*, 559 Pa. 297, 740 A.2d 186 (1999), *Mattco Forge, Inc.* v. *Arthur Young & Co.*, 5 Cal. App. 4th 392, 6 Cal. Rptr. 2d 781 (1992), on appeal after remand, 38 Cal. App. 4th 1337, 45 Cal. Rptr. 2d 581 (1995), on subsequent appeal, 52 Cal. App. 4th 820, 60 Cal. Rptr. 2d 780 (1997), and *Murphy* v. *A. A. Mathews*, 841 S.W.2d 671 (Mo. 1992) (en banc), the courts declined to follow *Bruce.* In *Murphy*, the plaintiff, Trustee of American Drilling Service Company Liquidating Trust (American), brought an action claiming that the defendant engineering firm was negligent in its performance of professional services, resulting in American being unable to support its claims for additional compensation in an underlying civil action. *Murphy* v. *A. A. Mathews*, supra, 672. The trial court dismissed the negligence claim based on witness immunity. See id. The Missouri Supreme Court, en banc, reversed, stating: "Witness immunity is an exception to the general rules of liability. It should not be extended unless its underlying policies require it be so." Id., 680. "While the rationale for witness immunity clearly supports application of the immunity to witnesses of unique fact or opinion who are otherwise unrelated to the litigation, it does not necessarily contemplate the situation of a professional who voluntarily agrees to assist a party in the litigation process for compensation." Id., 674. The court stated: "[W]e do not believe that immunity was meant to or should apply to bar a suit against a privately retained professional who negligently provides litigation support services." Id., 680. The *Murphy* court rejected the underpinnings of the majority decision in *Bruce*, including what it characterized as that court's broad interpretation of *Briscoe* v. *LaHue*, supra, 460 U.S. 325. The *Murphy* court further stated: "The function of providing expert litigation services is wholly different from the function of a police officer as analyzed in *Briscoe*. These experts do not usually act solely

as witnesses, but perform substantial pretrial work. Also, unlike the police officers, experts retained by one party voluntarily assume a professional duty to their client in exchange for direct monetary remuneration. Their advice is used to help their client make his or her case more persuasive. They function as paid advisors and as paid advocates." *Murphy* v. *A. A. Mathews,* supra, 680–81. "Due to the hired expert witness' function, we do not believe that the policy of ensuring frank and objective testimony is furthered by granting immunity. In most circumstances, these experts possess no independent factual knowledge concerning the litigation. Instead, they are usually retained to assist a party in preparing and presenting its best case in exchange for a fee. In practice, they function as professionals selling their expert services rather than as an unbiased court servant. Thus, immunizing an expert retained and compensated for providing litigation support services, does not advance this underlying policy." Id., 681.

The *Murphy* court also opined that the threat of liability would not "encourage experts to take extreme and ridiculous positions in favor of their clients in order to avoid a suit by them," nor would "litigants . . . be unable to retain experts to help prepare claims and present testimony." Id. Its decision, the court wrote, was "based primarily upon the commercial relationship assumed by the professional and his or her role as an advocate. . . . We find no reason or principle of public policy justifying the extension of witness immunity to professionals retained for litigation support services." Id., 682.

*LLMD of Michigan, Inc.,* is closely analogous to the present case. In *LLMD of Michigan, Inc.,* the plaintiff had brought a lawsuit for breach of contract. Its attorney retained the defendant expert on the issue of lost

profits arising out of the breach. As a result of a mathematical error committed by the defendant, however, its calculation of lost profits was undermined at trial on cross-examination and the defendant's opinion was stricken from the record by the trial judge. The plaintiff was constrained to settle its claim for $750,000. The defendant itself subsequently determined that an accurate estimation of the plaintiff's lost profits was $2.7 million. The plaintiff then sued the defendant for malpractice. The lower court granted the defendant's motion for summary judgment. *LLMD of Michigan, Inc.* v. *Jackson-Cross Co.*, supra, 559 Pa. 298. An intermediate appellate court, relying on *Panitz*, affirmed on the basis of witness immunity. Id.

After reviewing the policy considerations underlying the doctrine of witness immunity, the Pennsylvania Supreme Court reversed, stating: "We are unpersuaded, however, that those policy concerns are furthered by extending the witness immunity doctrine to professional negligence actions which are brought against an expert witness when the allegations of negligence are not premised on the substance of the expert's opinion. We perceive a significant difference between *Panitz* and [the plaintiff's] claim in this case that [the defendant] had been negligent in performing the mathematical calculations required to determine lost profits. The goal of ensuring that the path to truth is unobstructed and the judicial process is protected, by fostering an atmosphere where the expert witness will be forthright and candid in stating his or her opinion, is not advanced by immunizing an expert witness from his or her negligence in formulating that opinion. The judicial process will be enhanced only by requiring that an expert witness render services to the degree of care, skill and proficiency commonly exercised by the ordinarily skillful, careful and prudent members of their profession." Id., 306–307.

This court finds this reasoning apposite here. The policy on which witness immunity in Connecticut is based—having witnesses speak freely—is not implicated by the allegations of the complaint, which seek to hold the defendants accountable for not doing what they agreed to do. The motion to strike counts one, two and three based on the doctrine of witness immunity, therefore, is denied.

## IV

In the third count, the plaintiffs assert a claim under CUTPA against Panjabi and Cholewicki. The defendants argue that the third count is insufficient to maintain a CUTPA claim for several reasons.

The defendants' first argument is that the acts alleged in the revised complaint were not performed during the course of trade or commerce as required by General Stautes § 42-110b (a), but relate to being expert witnesses in a foreign legal proceeding.[7]

The defendants' argument is expressly based on *Haynes* v. *Yale-New Haven Hospital*, 243 Conn. 17, 38, 699 A.2d 964 (1997), in which our Supreme Court held that "the touchstone for a legally sufficient CUTPA claim against a health care provider is an allegation that an entrepreneurial or business aspect of the provision of services is implicated, aside from medical competence or aside from medical malpractice based on the adequacy of staffing, training, equipment or support personnel. Medical malpractice claims recast as CUTPA claims cannot form the basis for a CUTPA violation. To hold otherwise would transform every claim for medical malpractice into a CUTPA claim." In *Beverly Hills Concepts, Inc.* v. *Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 79, 717 A.2d 724 (1998), the Supreme Court

---

[7] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

extended this holding to the legal profession, holding that "only the entrepreneurial aspects of the practice of law," and not professional negligence or malpractice claims, are covered by CUTPA. (Internal quotation marks omitted.)

This court is not persuaded that the *Haynes-Beverly Hills Concepts, Inc.*, doctrine applies to the acts and omissions of Panjabi and Cholewicki. First, the Supreme Court in *Haynes* did not suggest that professional negligence, other than medical or legal malpractice, fell outside of CUTPA's ambit. This court does not read the *Haynes* court's statement that "professional negligence—that is, malpractice—does not fall under CUTPA," to state otherwise. *Haynes* v. *Yale-New Haven Hospital*, supra, 243 Conn. 34. With one exception, the cases relied on by the Supreme Court in *Haynes* dealt with claims against lawyers or medical providers. See id., 35–38. The one case that did not deal with lawyers or medical providers was cited for the proposition that " '[i]t would be a dangerous form of elitism, indeed, to dole out exemptions to our [consumer protection] laws merely on the basis of the educational level needed to practice a given profession, or for that matter, the impact which the profession has on society's health and welfare.' *United States* v. *National Society of Professional Engineers*, 389 F. Sup. 1193, 1198 (D.D.C. 1974) [vacated on other grounds, 422 U.S. 1031, 95 S. Ct. 2646, 45 L. Ed. 2d 686 (1975)]." *Haynes* v. *Yale-New Haven Hospital*, supra, 37–38. Trial courts should be cautious in extending a doctrine that exempts conduct from the reach of remedial legislation, such as CUTPA. See General Statutes § 42-110b (d); see also *Franco* v. *Mediplex Construction, Inc.*, Superior Court, judicial district of New Haven, Docket No. CV96390458 (March 22, 1999) (*Devlin, J.*) (declining to extend *Haynes* to architects). Such a doctrine could eviscerate the legislation.

Second, to the extent the *Haynes-Beverly Hills Concepts, Inc.* doctrine rested on the distinction between entrepreneurial or commercial aspects of a profession on the one hand, which are covered by CUTPA, and mere incompetence, which is not; see *Haynes* v. *Yale-New Haven Hospital*, supra, 243 Conn. 35–36; the defendants here are not aided. The plaintiffs' complaint contains allegations that go beyond claims of mere incompetence and include destroying data, bad faith and borderline extortionate conduct.

Third, the defendants are not benefited by *Advest Group, Inc.* v. *Arthur Andersen, LLP*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV970571417 (July 28, 1998) (22 Conn. L. Rptr. 520) (*Aurigemma, J.*), in which the court applied *Haynes* to accountants. In *Advest Group, Inc.*, Judge Aurigemma opined: "It is logical to extend the reasoning in *Haynes* to accounting malpractice claims. Accounting, like law and medicine, is a learned profession that is not interchangeable with other commercial endeavors. Deviations from the standard of care applicable to accountants are not the type of actions the consumer protection provisions of CUTPA were designed to prevent. Case law concerning accounting malpractice, the regulations of the State Board of Accountancy, and the rules of the American Institute of Certified Public Accountants more appropriately address such deviations." Id., 525.[8] Here, however, the court is not prepared to say that spinal biomechanics or kinesiology is a "learned profession" in the sense that there has evolved a body of case law or professional rules or regulations, of which this court is aware, governing the practice of these disciplines vis-à-vis those who retain the practitioners. Cf. *Commonwealth* v. *Brown*, 302 Mass. 523,

[8] Accord *Shareamerica, Inc.* v. *Ernst & Young*, Superior Court, judicial district of Waterbury, Docket No. CV930150132S (July 2, 1999) (*Sheldon, J.*); *Nacca* v. *Simione, Simione, Scillia & Larrow, LLC*, Superior Court, judicial district of New Haven, Docket No. 960387221 (May 28, 1999) (24 Conn. L. Rptr. 618) (*Jones, J.*).

527, 20 N.E.2d 478, appeal dismissed, 308 U.S. 504, 60 S. Ct. 96, 84 L. Ed. 432 (1939) (learned profession is characterized by need of unusual learning, existence of confidential relations and adherence to standard of ethics higher than that of market place).[9]

The defendants' second argument is that a simple breach of contract claim and a negligence claim are insufficient to support a CUTPA action. In response, the plaintiffs argue that they have alleged that the defendants committed more than simple negligence or breach of contract by destroying data and threatening to withhold testimony. The plaintiffs contend that the alleged acts qualify as unfair and deceptive acts that are unethical, oppressive and unscrupulous. Specifically, they argue that the defendants committed unfair and deceptive acts by destroying data to prevent the plaintiffs from examining and verifying the data and by threatening to withhold services from the plaintiffs and not testify in court if the plaintiffs did not first pay them additional moneys, not contractually agreed upon. The plaintiffs allege that the foregoing deceptive acts or practices, combined with Panjabi's alleged incompetence, constitute the basis for the CUTPA violation.

" '[T]he same facts that establish a breach of contract claim may be sufficient to establish a CUTPA violation.' *Lester* v. *Resort Camplands International, Inc.*, 27 Conn. App. 59, 71, 605 A.2d 550 (1992). Where the plaintiff alleges . . . aggravating circumstances, beyond a mere breach of contract that may bring the case within the 'cigarette rule,' the CUTPA claim may withstand a motion to strike." *Holeva* v. *M & Z Associates*, Superior

---

[9] This court does not read the *Haynes-Beverly Hills Concepts, Inc.*, doctrine as turning on whether one is engaged in a "learned profession," a singularly vague and analytically unhelpful term.

Court, judicial district of New Haven, Housing Session, Docket No. CV N.H. 9709-8403 (November 18, 1998) (*Levin, J.*). Here, the plaintiffs allege such aggravating circumstances, including Panjabi's refusal to perform the experiment again and testify in the second and third court appearances unless first paid by the plaintiffs. These allegations are sufficient under the cigarette test to survive the motion to strike the CUTPA count.

The defendants' third argument is that the allegations in the revised complaint constitute a single act, either a breach of contract or negligence, and do not constitute a pattern, practice or course of conduct which CUTPA requires. In reply, the plaintiffs argue that, although the Connecticut Appellate Court has not clearly decided the issue, other authority provides that a single act will suffice when the act relates to the actor's business activity. Nonetheless, the plaintiffs argue that even if this court were to find that a single act is insufficient to constitute a CUTPA claim, the defendants' alleged unfair or deceptive business practice was comprised of numerous bad acts, which occurred over the course of a year and involved multiple experiments, substantial client interaction, and several court appearances and, therefore, give rise to a CUTPA claim.

This court continues to concur, as it has in the past, with the reasoning of those cases that have held CUTPA to be applicable to a single transaction that occurs in the conduct of any trade or commerce. See, e.g., *Bank of New Haven* v. *Karas Motors, Inc.*, Superior Court, judicial district of New Haven, Docket No. 414574 (July 28, 1999) (*Levin, J.*); *Holeva* v. *M & Z Associates*, supra, Superior Court, Docket No. CV N.H. 9709-8403. Although there is a split of authority within the Superior Court as to whether a single act is sufficient to constitute a violation of CUTPA; see *L. Suzio Concrete Co.* v. *Citizens Bank of Connecticut*, Superior Court, judicial district of New Haven, Docket No. CV970398079

(August 7, 1998) (*Silbert, J.*); the majority of Superior Court decisions have held that a party need not allege more than a single act of misconduct to bring an action under CUTPA.[10] To the extent that this unfortunate discord in the case law may be ascribed to the plural form in which the basic prohibition of CUTPA is phrased; see footnote 7 of this opinion; it is telling that General Statutes § 1-1 (f) provides in pertinent part that "words importing the plural number may include the singular." While this rule is directory and only discrete applications of it are favored; *Shawhan* v. *Langley*, 249 Conn. 339, 347, 732 A.2d 170 (1999); the defendants have pointed to nothing else in the text of CUTPA, its legislative history or the interpretation of the Federal Trade Commission Act by the Federal Trade Commission or the federal courts[11] that requires the commission of multiple unfair or deceptive acts or practices before civil liability in a private cause of action may be imposed. Compare *Winchester* v. *State Board of Labor Relations*, 175 Conn. 349, 359, 402 A.2d 332 (1978) (plural of word not construed as including singular where elsewhere text reflects that plural was intended).

---

[10] See, e.g., *Giacomo* v. *USF&G Ins. Co.*, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV980164760 (September 10, 1998) (*D'Andrea, J.*); *Abrams* v. *Riding High Dude Ranch*, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV970345046 (February 5, 1998) (*Skolnick, J.*); *Lovick* v. *Nigro*, Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. LPL-CV940542473S (February 24, 1997) (*Lager, J.*); *Glaser Realty Associates* v. *Joshua Morris Publishing, Inc.*, Superior Court, judicial district of Danbury, Docket No. 322785 (January 15, 1997) (*Moraghan, J.*); but see *Morgan* v. *Tolland County Health Care, Inc.*, Superior Court, judicial district of Hartford-New Britain at New Britain, Docket No. CV95469204S (February 9, 1996) (16 Conn. L. Rptr. 294, 296) (*Handy, J.*).

[11] General Statutes § 42-110b (b) provides: "It is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a)(1) of the Federal Trade Commission Act (15 USC 45 (a)(1)), as from time to time amended."

Moreover, in their complaint, the plaintiffs allege multiple acts that may fairly be characterized as unfair or deceptive. As has already been recounted previously in this opinion, the defendants allegedly refused, on two separate occasions, to perform the tests; further, they destroyed data and refused to testify for the second and third court appearances unless the plaintiffs first paid them additional moneys.

The defendants' final argument with respect to the legal sufficiency of the plaintiffs' CUTPA claim is that the challenged conduct can neither be characterized as offensive to public policy, immoral, unethical nor oppressive, and cannot be found to have caused substantial consumer injury. As already observed, the plaintiffs have alleged that the defendants destroyed data to prevent them from examining and verifying the data and threatened to withhold services and not testify in court if they were not first paid additional moneys. These acts are sufficient to satisfy the second prong of the "cigarette test" because the alleged conduct is offensive to public policy, unethical or oppressive. The motion to strike the CUTPA count against Panjabi and Cholewicki, therefore, is denied.

V

In the CUTPA count of their revised complaint, the plaintiffs allege again the facts on which they claim that Panjabi and Cholewicki are liable under CUTPA and further add that Yale as well is liable under the doctrine of respondeat superior. Under the doctrine of respondeat superior, a master is liable for the torts of his servant. *Bria* v. *St. Joseph's Hospital,* 153 Conn. 626, 630, 220 A.2d 29 (1966). Yale argues that the nature of Panjabi and Cholewicki's acts precludes liability against Yale based on the doctrine of respondeat superior. The sole appellate authority on which Yale's argument is based is *A-G Foods, Inc.* v. *Pepperidge Farms, Inc.,*

216 Conn. 200, 579 A.2d 69 (1990). That case is clearly distinguishable.

In *A-G Foods, Inc.*, the defendant's employee committed an intentional tort, fraud, by charging the plaintiff's stores for goods he had not delivered. The Supreme Court stated: "[I]n order to hold an employer liable for the intentional torts of his employee, the employee must be acting within the scope of his employment and in furtherance of the employer's business. . . . [I]t must be the affairs of the principal, and not solely the affairs of the agent, which are being furthered in order for the doctrine [of respondeat superior] to apply." (Citations omitted; internal quotation marks omitted.) Id., 208. "[T]he vital inquiry in this type of case is whether the servant on the occasion in question was engaged in a disobedient or unfaithful conducting of the master's business, or was engaged in an abandonment of the master's business." (Internal quotation marks omitted.) Id., 210. The Supreme Court in *A-G Foods, Inc.*, held that the evidence at trial did not support a finding that the employee was acting within the scope of his employment and in furtherance of the employer's business. Id. It further held that negligent supervision by an employer of an employee who commits an intentional tort is, without more, insufficient to support CUTPA liability against the employer. Id., 208.

"It is fundamental that in determining the sufficiency of a complaint challenged by a defendant's motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted. . . . Indeed, pleadings must be construed broadly and realistically, rather than narrowly and technically." (Citation omitted; internal quotation marks omitted.) *Doe* v. *Yale University*, 252 Conn. 641, 667, 748 A.2d 834 (2000). "[I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied." Id. At this juncture there is no question of the sufficiency

of proof, as there was in *A-G Foods, Inc.* See *Duff* v. *Boppers of New Haven, Inc.*, Superior Court, judicial district of New Haven, Docket No. CV940359966 (September 19, 1994) (*Hodgson, J.*). The plaintiffs have expressly alleged that Panjabi and Cholewicki were acting as the agents, servants or employees of Yale, that all experiments were performed using Yale's laboratory and equipment, and that Yale was paid $2000 for Panjabi's use of Yale's property and personnel. The motion to strike the CUTPA count against Yale, therefore, must be denied.

## VI

## CONCLUSION

For the aforementioned reasons, the defendants' motion to strike is denied.