805 So.2d 1118 (2002)
Aizenhawar (Aizen) J. MARROGI
v.
Ray HOWARD and Ray Howard & Associates, Inc.
No. 2001-CQ-1106.
Supreme Court of Louisiana.
January 15, 2002.
*1119 Jeffery C. Vaughan, Lead Counsel, William C. Beary, Peter J. Butler, Peter J. Butler, Jr., New Orleans, Counsel for Appellant.
Anthony P. Dunbar, New Orleans, Kenneth B. Wright, Counsel for Appellee.
*1120 CALOGERO, Chief Justice.[*]
We accepted the certified question presented to this court by the United States Fifth Circuit Court of Appeals in Marrogi v. Howard, 248 F.3d 382, 386 (5th Cir. 2001).[1] The question is this: "Under Louisiana law, does witness immunity bar a claim against a retained expert witness, asserted by a party who in prior litigation retained that expert, which claim arises from the expert's allegedly deficient performance of his duties to provide litigation services, such as the formulation of opinions and recommendations, and to give opinion testimony before or during trial?" For the reasons that follow, we answer that question in the negative.

FACTS and PROCEDURAL HISTORY
In 1997, Aizenhawar (Aizen) J. Marrogi, M.D., brought suit in a Louisiana state court against the Tulane Educational Fund d/b/a the Tulane University School of Medicine ("Tulane"), seeking to recover fees for professional medical services that Dr. Marrogi performed while employed by Tulane but for which Tulane allegedly failed to bill or underbilled.[2] After filing suit, Dr. Marrogi retained the services of Ray Howard and his consulting firm, Ray Howard & Associates, Inc. (collectively referred to as "Howard"), to provide pretrial analysis and litigation support services. Howard, a Florida resident, held himself out as an expert in medical billing and coding. The agreement between Dr. Marrogi and Howard specifically called for Howard (1) to review pathology reports that would be sent to him from Louisiana, (2) to submit reports and affidavits to Dr. Marrogi's Louisiana attorney for use in preparing for and prosecuting the claim against Tulane, (3) to testify in depositions, and (4) to testify in hearings and at trial in Louisiana. Howard was paid a retainer of $1,200.00 and additional remittances totaling roughly $7,000 to $10,000.
In the course of the Marrogi/Tulane litigation, the Civil District Court for the Parish of Orleans ruled that Dr. Marrogi would be permitted only limited discovery of Tulane's medical records, i.e., records for one fiscal year out of the five years in question, unless he could establish a billing discrepancy or discrepancies in that one year. After reviewing the pathology reports, together with a billing and coding schedule for the one fiscal year, Howard provided Dr. Marrogi with an affidavit containing Howard's opinion that Tulane should have billed $523,485.00 for Dr. Marrogi's services during that fiscal year. In fact, Tulane had billed less than $250,000 for those services, an alleged difference of some $273,485. Relying on the billing discrepancies identified by Howard in his affidavit, Dr. Marrogi filed a motion to compel Tulane to produce the other four years of its medical records. At the hearing on the motion to compel, Tulane pointed to numerous mathematical errors in Howard's affidavit, as well as errors in his assignment of prices to coded services. In light of these errors, the court ordered that Howard submit to a deposition prior to the *1121 court's considering the merits of the motion to compel.
At the request of Dr. Marrogi, Howard thereupon prepared and submitted a revised opinion that reduced to $392,740.00, rather than the earlier $523,485, the amount that Tulane should have billed for Dr. Marrogi's services during the one fiscal year under review. Dr. Marrogi furnished a copy of this revised opinion to Tulane. Then, under questioning at the deposition, Howard was forced to admit to having made additional pricing and coding errors in his revised opinion. During a break in the deposition, Howard informed Dr. Marrogi's attorney that he was disgusted by the numerous errors that he had made and that he would neither participate in the remainder of his scheduled deposition nor provide any of the other litigation support that he had contracted to furnish.
Thereafter, Tulane filed a motion for summary judgment, seeking dismissal of Dr. Marrogi's suit. In support of the motion, Tulane submitted Howard's deposition testimony to demonstrate that Dr. Marrogi was unable to produce any credible evidence of underbilling. The Civil District Court, Parish of Orleans, granted the motion and dismissed the suit.[3]
After dismissal of this state court litigation, Dr. Marrogi filed a lawsuit against Howard in the United States District Court for the Eastern District of Louisiana, alleging two causes of action: negligence and beach of contract, or in the alternative, unjust enrichment. With regard to the negligence claim, Dr. Marrogi asserted that Howard had held himself out as an expert in medical billing and coding, that Howard made numerous mathematical and coding errors in analyzing the pathology reports, that the inaccurate analysis resulted in the dismissal of Dr. Marrogi's claims against Tulane, that Howard's actions breached the professional duties owed to Dr. Marrogi, and that Howard is liable to Dr. Marrogi for all losses incurred as a result thereof. With respect to the contract claim, Dr. Marrogi asserted that Howard's inaccurate analysis and his failure to continue performance under the contract constituted breaches of the agreement, that Howard had either billed or overbilled for the deficient services Howard had performed under the agreement, and that Dr. Marrogi was entitled to the sums paid to Howard under the agreement, either as contract damages, or for unjust enrichment.
Howard subsequently filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), arguing that, under Louisiana's witness immunity doctrine, Dr. Marrogi's action failed to state a claim upon which relief could be granted.[4] Howard asserted he was absolutely immune from suit because the claims were the result of his actions as a witness in a court proceeding. In opposition to Howard's motion, Dr. Marrogi argued that the witness immunity doctrine does not preclude a claim for professional malpractice against an expert witness by the party who had retained the expert witness.
Before granting the 12(b)(6) motion, the United States district court judge noted that no court applying Louisiana law has ever addressed the issue of witness immunity in the context of a party suing his own *1122 retained expert witness over the expert's performance of litigation support services. While the federal district court judge observed that Dr. Marrogi's position on the issue of retained expert witness immunity was "fully supported" by a Pennsylvania Supreme Court case, LLMD of Michigan, Inc. v. Jackson-Cross Co., 559 Pa. 297, 740 A.2d 186 (1999), she nonetheless stated that she was "unable and unwilling to be the first court to recognize such a modification of Louisiana law." The judge acknowledged "a certain logic to the rationale adopted by the LLMD court," but she also expressed concern that making an exception to the general rule of witness immunity for retained expert witnesses might entail "a multitude of evidentiary and practical problems in its application." The federal judge concluded that, under Louisiana law, Howard is entitled to absolute immunity like any other witness. Accordingly, the judge dismissed Dr. Marrogi's action with prejudice.
On appeal, the United States Fifth Circuit Court of Appeals found that the case turned on an important issue of first impression under Louisiana law, noting that no Louisiana court (or any other court applying Louisiana law) has addressed, much less decided, whether the general principle of witness immunity admits of an exception for the retained expert witness who is alleged to have performed litigation support duties deficiently, to the detriment of the party who retained that expert. The Fifth Circuit concluded this court should more properly address that issue, hence the certified question.

DISCUSSION
We initially dispose of defendant Howard's assertion that this court should not issue what in effect would be either an improper advisory opinion or an opinion contingent upon uncertain events. Under the circumstances of this case, we do not agree that our answer to the question certified to us will be either simply advisory or contingent.
Defendant Howard's "advisory" opinion argument is premised upon the federal district court's finding the existence in that court of personal jurisdiction. He contends the federal district court found personal jurisdiction only because Dr. Marrogi's petition and argument in that court were directed toward the presentation and effect of Howard's affidavit and deposition testimony upon the prior litigation in the Orleans Parish civil district court. As support for this contention, Howard points out that the federal district court, in a footnote, indicated that it would not have had personal jurisdiction over a claim of negligent preparation alone because that activity had occurred wholly in Florida.[5] Howard maintains that Dr. Marrogi on appeal to the Fifth Circuit retrenched from his original focus in the federal district court, i.e., on the presentation and effect of Howard's affidavit and deposition testimony upon the Louisiana litigation, and instead couched his argument, as he does now in this court, in terms of Howard's negligent preparation and formulation of his opinion, acts that allegedly occurred wholly in Florida. Asserting that the federal district court does *1123 not have personal jurisdiction if the focus is on the formulation of his opinion, acts that transpired in Florida, Howard argues that this court's present opinion will, therefore, necessarily be contingent upon a change in the federal district court's decision. He asks that we eschew deciding the question proposed by Dr. Marrogi and, assuming we have the authority to do so, "remand" the matter to the federal district court for dismissal.
We decline Howard's invitation to review the propriety of the rulings of the federal courts on the issue of personal jurisdiction. Howard unsuccessfully raised this same personal jurisdiction argument in his brief in the Fifth Circuit. In its opinion, the Fifth Circuit pointedly noted that the federal district court had expressly found defendant Howard subject to personal jurisdiction and that Howard had not appealed or cross-appealed that ruling. 248 F.3d at 383 n. 1. The appellate court further noted that, unlike subject matter jurisdiction, personal jurisdiction may be acquiesced in, or waived. Id. Given these observations by the federal appellate court certifying the question to us, we conclude that the federal courts have decided the issue of personal jurisdiction and that they have done so adversely to defendant Howard. We refuse to revisit the issue of personal jurisdiction in the federal courts. Accordingly, we do not believe that our determination on the question certified is contingent in any way, nor impermissibly advisory.[6]
Additionally, there can be no doubt that a justiciable controversy exists here. See Abbott v. Parker, 259 La. 279, 249 So.2d 908, 918 (1971). The Fifth Circuit, though it disclaimed any desire to have us confine our reply to the precise form or scope of the question presented, nevertheless stated that our answer will determine the issue presented on appeal to that court: If the exception to witness immunity for retained expert witnesses is recognized, then the case will be remanded by the Fifth Circuit Court of Appeals to the United States District Court for further proceedings. If the exception is not recognized, and witness immunity is indeed applicable, then the federal district court's dismissal of the suit with prejudice will be affirmed by the Fifth Circuit Court of Appeals. 248 F.3d at 386. In light of the federal appellate court's statements, we find no merit to defendant Howard's argument.

WITNESS IMMUNITY or PRIVILEGE in LOUISIANA
We next turn to the question certified to us, and Howard's contention that this court should uphold our "longstanding and broad tradition" of witness immunity and refrain from creating an exception to that tradition for retained or friendly experts. However, the privilege of witness immunity is itself an exception to general tort liability; thus, the question before us is whether we should extend and broaden that exception by applying the privilege of witness immunity to retained or friendly experts so as to shield them from a malpractice suit by the party that hired them. In answering this question in the negative, we first examine the history of witness immunity in Louisiana to determine the underlying policy reasons that resulted in the crafting of the privilege, and then conclude that these policy reasons do not justify protecting a retained expert from malpractice liability in this case where the expert was hired to assist his client in a judicial proceeding by reviewing medical billing reports and making certain calculations, *1124 but made errors in performing these services.
In Louisiana, the affirmative defense of witness immunity or privilege has evolved from the jurisprudence.[7] Since the 1800s, this court has recognized the rule that, at least in the context of defamation suits against adverse witnesses, immunity from a civil action attaches to a witness in judicial or quasi-judicial proceedings. Oakes v. Walther, 179 La. 365, 154 So. 26, 27 (1934); Burke v. Ryan, 36 La. Ann. 951 (1884); Terry v. Fellows, 21 La. Ann. 375 (1869). The policy basis for this rule has been explained as follows: "The administration of justice requires the testimony of witnesses to be unrestrained by liability to vexatious litigation. The words they utter are protected by the occasion, and cannot be the foundation for an action for slander." Terry v. Fellows, 21 La. Ann. at 376.[8] More recently, in Knapper v. Connick, 96-0434, p. 3 (La.10/15/96), 681 So.2d 944, 946, we stated that "communications made in judicial or quasi-judicial proceedings carry an absolute privilege so that witnesses, bound by their oaths to tell the truth, may speak freely without fear of civil suits for damages."[9]
The court in the 1869 Louisiana Supreme Court decision, Terry v. Fellows, further explained that "[w]itnesses, like jurors, appear in court in obedience to the *1125 authority of the law, and therefore may be considered as well as jurors to be acting in the discharge of a public duty, and though [they are liable to prosecution for perjury or for conspiracy to give false testimony], they are not responsible in a civil action for any reflections thrown out in delivering their testimony." 21 La.Ann. at 376-77, quoting Thomas Starkie, A Treatise on the Law of Slander and Libel, and Incidentally of Malicious Prosecutions, vol. II, p. 242 (2d English Ed. 1830) (hereinafter Starkie on Slander).[10] The court stated that "an action of slander does not lie for anything said or done in the course of a judicial proceeding." 21 La.Ann. at 377, citing Starkie on Slander, vol. II, p. 254.
In general, witness immunity is an "absolute privilege" because the privilege protects the witness from civil suit regardless of malice or falsity. See Burke v. Ryan, 36 La. Ann. at 951-52; see also Lauga v. McDougall, 463 So.2d 754 (La. App. 4th Cir.1985)(police officer who testified against the plaintiff at grand jury proceedings and trials was absolutely immune from prosecution for a defamation action even if his testimony were false). At English common law, absolute witness immunity required no showing that the allegedly defamatory statements were relevant to the proceeding. See Briscoe v. LaHue, 460 U.S. 325, 331 n. 11, 103 S.Ct. 1108, 1113 n. 11, 75 L.Ed.2d 96, 104 n. 11 (1983). In Louisiana, the rule of witness immunity is somewhat narrower, to the extent that the witness's declarations "cannot serve as the foundation for a civil suit when they are pertinent and material." Oakes v. Walther, 154 So. at 27, citing Burke v. Ryan, supra.
In Burke v. Ryan, the plaintiff sued the defendants, who had, under threat of subpoena, signed affidavits in an earlier case to the effect that the plaintiff had a poor reputation for truth and veracity. These affidavits, procured by an attorney representing a criminal defendant in the earlier case in which the plaintiff had apparently testified, were filed in support of a motion for new trial in that case based on newly discovered evidence. In reversing the jury's award for the plaintiff in the subsequent libel case, the court stated:
It needs no elaborate reference to authorities to establish the proposition of law; that as witnesses, who appear in a court of justice, discharge a public duty; that, though they be liable to a prosecution for perjury, should they commit such, they are not responsible, in a civil action, for any reflection thrown out in delivering their testimony, or for anything said or published by them in the course of a judicial proceeding, even if the statement be false, malicious and without probable cause. There is put this qualification, however: that statements thus made, in the course of an action, must be pertinent and material to the issue.
* * *
The authorities are also to the effect that every affidavit sworn to in the course of a judicial proceeding in a court of competent jurisdiction is absolutely privileged and no action lies therefor, however false and malicious may be the statement therein contained.
36 La.Ann. at 951-52 (citations omitted). The court in Burke v. Ryan reasoned that the affidavits were legal evidence and that they were applicable, pertinent, and material to the issue raised by the motion for new trial. Accordingly, the affidavits were *1126 protected communications, and the affiants were absolutely immune from civil liability.
In short, our courts have long recognized the general rule that there is absolute immunity from civil liability for testimony given by a non-party witness in a judicial proceeding, so long as that testimony is pertinent and material to the issue. See Oakes, supra.[11] Thus, as in a number of other American jurisdictions, once the threshold showing is made that the allegedly defamatory statements were relevant to the judicial proceeding, the privilege of absolute immunity protects the witness from civil liability regardless of malice or falsity. See Briscoe v. LaHue, 460 U.S. at 331 n. 11, 103 S.Ct. at 1113 n. 11; see also Murphy v. A.A. Mathews, 841 S.W.2d 671, 675-77 (Mo.Sup.Ct.1992).
Courts in Louisiana have not restricted application of absolute witness immunity to just defamation and libel/slander cases, but have also applied the privilege to retaliation cases against adverse witnesses, including experts. For example, in Moity v. Busch, 368 So.2d 1134, 1136 (La.App. 3rd Cir.1979), concerning the testimony of an expert witness, the court of appeal found the witness's testimony to be absolutely privileged. There, the plaintiff sued the expert witness retained by the defendant in the prior litigation, alleging that the expert witness's testimony, filed in support of a motion for summary judgment, had been defamatory and consisted of untrue results and that the witness had not been qualified to give expert opinion testimony in the field of structures and paint.[12] The court of appeal, in affirming summary judgment in favor of the expert witness defendant, cited Terry v. Fellows, supra, and Bienvenue v. Angelle, 254 La. 182, 223 So.2d 140 (1969), for the proposition that testimony given at a judicial proceeding by a non-litigant witness carries with it absolute immunity from a defamation suit stemming from the utterance of such testimony. 368 So.2d at 1136. The court went on to say that, "[a]s an accepted qualified expert witness, [the defendant] was free to give his opinion whether others might disagree with his conclusions or not." Id. Thus, an adverse expert witness was found to be immune from a retaliation suit filed by the losing party in the earlier litigation, so that witnesses in a judicial proceeding may speak freely without fear of civil liability and, thus, preserve and protect the truth finding objective of the administration of justice.
*1127 The privilege of absolute immunity, however, has not been extended in every suit against a witness or affiant in a prior judicial or quasi-judicial proceeding. In Goldstein v. Serio, 496 So.2d 412, 415 (La.App. 4th Cir.1986), writs denied, 501 So.2d 208, 209 (La.1987), the court refused to apply the privilege as an affirmative defense to defeat a claim for malicious prosecution or abuse of process. There, the plaintiffs, attorneys, sued former clients who had filed a complaint with the Louisiana State Bar Association alleging improprieties committed by the plaintiff attorneys during their earlier representation. The court observed that the privilege applies only to statements communicated to third persons; thus, it is a defense only to a claim of defamation. The court reasoned, "In both malicious prosecution and abuse of process, the crux of the action is not the statements made but the fact that a proceeding was maliciously and/or illegally pursued." 496 So.2d at 415. Thus, the privilege applies to preserve candor in the attorney disciplinary system, yet complaints to the bar under-taken in malice or in abuse of process are not worthy of such protection.[13]
A few Louisiana courts have discussed absolute judicial immunity from civil suit in the context of court-appointed experts. In S.T.J. v. P.M., 556 So.2d 244 (La.App. 2nd Cir.1990), the court held that three psychologists appointed by the court during a custody dispute to evaluate an allegation of sexual abuse of a minor were entitled to absolute judicial immunity from any tort liability asserted in a subsequent suit filed by the losing parent. The court reasoned that the appointed professionals were non-judicial persons fulfilling quasi-judicial functions and, pursuant to La.Code Civ. Proc. art. 373, are classified as officers of the court with functions intimately related to the judicial process. Therefore, such court-appointed experts are entitled to absolute judicial immunity, as are judges, protecting them from having to litigate the manner in which they perform these functions. 556 So.2d at 247, relying on Myers v. Morris, 810 F.2d 1437 (8th Cir.1987) (psychologists-therapists who evaluated child victims of alleged sexual abuse have absolute immunity for damages arising from their performance of delegated functions).[14] The court opined, "Should they be found unprotected by such immunity, it can be envisioned that psychologists would seek to avoid future court appointments and that fear of civil liability could mar opinions and recommendations given to the court." 556 So.2d at 247.
In sum, the privilege of absolute witness immunity is an exception to tort liability under La. Civ.Code art. 2315. Louisiana courts have narrowly tailored the exception to protect the particular interests involved. In the case of adverse witnesses, both non-volunteer witnesses *1128 and expert witnesses, we have identified the protected interest as the administration of justice and its objective to uncover the truth. To further that interest, Louisiana courts have applied the privilege of witness immunity in defamation actions and retaliation suits against adverse witnesses. Until today, neither this court nor any other Louisiana court of appeal has been called upon to decide whether the administration of justice is, on balance, furthered by applying the privilege of absolute witness immunity to protect a "friendly expert" from a subsequent suit by the party that hired him, alleging that the expert was deficient in the performance of his duties to provide litigation services, including formulating opinions and recommendations, as well as giving testimony before or during trial. We thus turn to the precise issue presented to us.

WITNESS IMMUNITY and RETAINED EXPERTS
Does witness immunity bar a claim against a retained expert witness asserted by a party who in prior litigation hired that expert, which claim arises from the expert's allegedly deficient performance of his duties to provide litigation services, such as the formulation of opinions and recommendations, and to give testimony before or during trial? That question has become one of increasing importance given the rapid growth in the number of professionals and others hired to provide litigants with assistance in the preparation and presentation of their cases. There has been much scholarship on the issue, with the majority of commentators arguing against extending absolute witness immunity to retained or friendly experts.[15] Not surprisingly, there is a growing body of case law on the issue as well, again with the majority of courts finding that no policy interest is served by immunizing negligent litigation support professionals from malpractice and breach of contract liability under the rubric of witness immunity.[16]
Dr. Marrogi asserts that retained experts should not be entitled to witness immunity from civil liability for their negligence in the formulation of their opinion. He contends, citing Goldstein v. Serio, supra, that witness immunity has not been extended to bar all claims simply because they arise out of conduct that occurred during judicial proceedings. Instead, he argues, witness immunity is an affirmative defense only to those claims that have as an element communication to *1129 third persons during the course of judicial proceedings. Because his claim focuses only on the formulation of defendant Howard's opinion, rather than the communication of that opinion to third persons, Dr. Marrogi contends witness immunity should not bar his suit against Howard alleging breach of contract and breach of professional duties.
Defendant Howard argues that the policy behind witness immunity applies equally to the hired expert witness. The defendant asserts that the truth-finding function would be undermined if experts, with an eye toward their own liability, steadfastly refuse to acknowledge errors or modify their views in light of additional information. Defendant Howard contends that Louisiana courts have uniformly determined that expert witnesses may not be sued for damages arising out of their testimony, and that there should be no distinction between "friendly experts" and any other. Defendant Howard argues that those cases also involved a breach of a duty owed by the expert.[17] However, the reasoning in S.T.J. and Rogers v. Janzen for extending absolute judicial immunity to court-appointed professionals, i.e., those experts to whom the court has delegated quasi-judicial functions, does not easily translate to extending the privilege of witness immunity to a so-called "friendly expert" retained by a party. Similarly, the cases involving retaliation suits against an adverse expert do not address the issue of a retained expert's negligence toward his own client.
We next consider two approaches to the issue presented. And for the reasons set forth below, we conclude that no overarching public purpose is served by applying witness immunity to shield a retained expert witness from a claim subsequently asserted by the party who hired him when the claim alleges deficient performance of his professional and contractual duties to provide litigation support services.
One court that has applied the doctrine of witness immunity to preclude suits against a "friendly" expert witness is the Washington Supreme Court in Bruce v. Byrne-Stevens & Associates Engineers, Inc., 113 Wash.2d 123, 776 P.2d 666 (1989). There, the plaintiffs' land was damaged. At trial, they offered the testimony of their retained engineering expert, who estimated the cost of restoring the property at approximately $21,000. Although the plaintiffs prevailed, they later discovered that the engineer expert had underestimated the cost of restoration by about half. The plaintiffs thereafter sued their expert for negligence in preparing his analysis and testimony, arguing that, but for the expert's low estimate, they would have recovered the full cost of restoration from the original defendant.
*1130 A plurality of the Washington Supreme Court found that absolute immunity precluded suit against the expert witness for his testimony in judicial proceedings and that such immunity attached to acts and communications that occur in connection with the preparation of that testimony. The court opined that, in the absence of immunity, two forms of indirect censorship would develop: (1) the imposition of liability would discourage anyone who is not a full-time professional expert witness from testifying, because one-time or infrequent experts might not carry the necessary insurance to cover the liability risk in testifying, and (2) the expert witness might shade or distort his testimony out of fear of subsequent liability, perhaps losing objectivity or adopting the most extreme position favorable to his client. Id. at 670. These latter tendencies, the court believed, would deprive the finder of fact of candid, objective, and undistorted evidence. The court concluded that the imposition of witness liability was not necessary to secure accurate information for the finder of fact, because expert witness reliability is adequately ensured by the witness's oath, the hazard of cross-examination, and the threat of a perjury prosecution. Id. at 670, 673.[18]
While the Washington Supreme Court applied the privilege to a retained expert, the majority of the other courts that have addressed this issue have not applied the privilege of witness immunity to retained experts. See Note 16, supra. In a case factually similar to the instant case, the Pennsylvania Supreme Court concluded that the doctrine of witness immunity does not extend to bar professional malpractice actions against professionals hired to perform services related to litigation. LLMD of Michigan, Inc. v. Jackson-Cross Co., 559 Pa. 297, 740 A.2d 186 (1999). There, the plaintiff had prosecuted a breach of contract claim against lenders who had allegedly failed to provide financing for the purchase and rehabilitation of an industrial facility. The plaintiff hired an accounting firm to assist it in calculating the lost profits as a result of the lenders' breach. The agreement between the plaintiff and the accounting firm contemplated that the latter would quantify the damages, prepare a signed report, and participate in pre-trial conferences, depositions, and trial. The accounting firm provided the plaintiff with a calculation of lost profits amounting to some $6 million, and the firm's principal testified at trial to that effect. However, on cross-examination, opposing counsel established that the calculation contained a mathematical error that completely undermined its veracity. The witness had not personally performed the calculation and thus could not explain the error's effect or recalculate the alleged lost profits. The testimony and calculation were stricken from the record because they were based on erroneous mathematical calculations. Without this expert testimony, the plaintiff was left with its own testimony and calculation of lost profits. The day after the expert's testimony was *1131 stricken, the plaintiff settled with the lenders for $750,000.00.
Thereafter, the plaintiff sued the accounting firm, alleging that the firm had breached its agreement to furnish expert services by failing to deliver an accurate or workmanlike lost profits calculation and had failed to exercise the degree of care and skill ordinarily exercised by experts in the field of real estate counseling and computation of lost profits in real estate transactions. The district court granted summary judgment. On appeal, the intermediate appellate court affirmed on different grounds, concluding that the doctrine of witness immunity barred the plaintiffs action.
The Pennsylvania Supreme Court reversed, finding that the action was not barred by the doctrine of witness immunity. The court reviewed the doctrine, noting that, in the context of defamation actions, participants in judicial proceedings have an absolute privilege for the communications related to the proceedings. The court also recognized the policy basis for the doctrine, but noted that the privilege exists because the courts have other internal sanctions against defamatory statements, such as perjury or contempt proceedings. The court noted that the privilege furthers the two-fold policy of ensuring that the path to the truth is left as free and unobstructed as possible and of protecting the judicial process. The court did not believe that the same policy considerations were furthered by extending the privilege to professional negligence actions that are prosecuted by a former client against an expert witness who has been negligent in formulating his opinion. While cautioning that the substance of the expert's opinion testimony may not form the basis for a subsequent suit, the court concluded that the judicial process is enhanced by holding an expert witness to the degree of care, skill, and proficiency commonly exercised by members of his or her profession.[19]
After reviewing the cases from the courts of our sister states, as well as the applicable policy considerations, we hold that claims in connection with a retained expert's alleged failure to provide competent litigation support services are not barred by the doctrine of witness immunity. The privilege of witness immunity in Louisiana has been applied in defamation and defamation-like cases, as well as retaliation cases against adverse witnesses, expert and otherwise. The policy underlying that rule is that witnesses must be permitted to speak freely and without fear of exposure to vexatious litigation where a search for the truth is before the factfinder. However, that laudable objective is not advanced by immunizing the incompetence of a party's retained expert witness simply because he or she provides professional services, including testimony, in relation to a judicial proceeding. Witness immunity itself is an exception to tort liability, and thus should be narrowly construed in light of our Civil Code's provision that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ.Code art. 2315. Furthermore, immunity from tort liability is, generally, recognized *1132 only to promote an overarching public purpose.
We agree that the finder of fact must be able to rely on "candid, objective, and undistorted evidence." Briscoe v. LaHue, 460 U.S. at 333, 103 S.Ct. at 1114. However, we do not believe that shielding a client's own professional witness from malpractice liability is necessary to ensure that frank and objective testimony is presented to the fact-finder. A party's retained expert witness, rather than a court-appointed expert, for example, contracts for monetary remuneration with a party to assist in preparing and presenting his case not only in the best light possible but also, surely, in a competent fashion. Thus, the retained expert's function is not only to assist the court or fact-finder in understanding complicated matters, but also to render competent assistance in supporting his client's action against the client's opponent. The Bruce court assumed that in the absence of immunity, the expert would be motivated not simply by frankness and objectivity, but by the fear of exposure to civil liability among other considerations. Properly viewed, however, the roles of "hired gun" and servant of the court are not necessarily incompatible. In reality, the expert retained for litigation is hired to present truthful and competent testimony that puts his client's position in the best possible light. The expert witness's oath, the heat of cross-examination, the threat of a perjury prosecution, and, not least, the expert's professional ethics code all serve to limit the feared excesses of an expert subject to malpractice liability.[20] Moreover, the absence of immunity will not only encourage the expert witness to exercise more care in formulating his or her opinion but also protect the litigant from the negligence of an incompetent professional. Given these considerations, witness immunity does not serve an overarching public purpose in barring a client's suit against his own hired professional who deficiently performs agreed upon litigation support services.
The correctness of our view lies in the facts, alleged and established, in the instant case. In this case, defendant Howard, who had allegedly held himself out as an expert in the field of medical billing, got paid to review a set of medical reports and billing records, to make calculations based on this review, and, thereafter, to present his correct calculations and assumptions in court. Instead, the defendant made erroneous calculations and, when that fact was made known to him, he abandoned his client, rather than continue to assist him in the litigation, and kept the money that he was paid. Clearly then, Dr. Marrogi has made the allegation that the defendant was negligent, not in having a particular opinion, but in formulating his opinion, i.e., the defendant was negligent in performing professional services such as calculations upon which his expert opinion testimony would ultimately be based. That defendant Howard's erroneous calculations were, in this case, presented in an affidavit and in deposition testimony, rather than, say, a written report, does not change our view that an expert witness hired to perform litigation support services, but who performs those services in a negligent manner, cannot hide from civil liability to his client behind the shield of witness immunity.
The benefit to the judicial system in the rule we announce today is a practical one: ridding the system of incompetent experts and ensuring that reliable opinion testimony is presented to the fact-finder. The *1133 Washington Supreme Court in Bruce speculated that the lack of immunity will result in less truthful expert testimony.[21] With no sanction for incompetent preparation, however, an expert witness is free to prepare and testify without regard to the accuracy of his data or opinion. We do not see how the freedom to testify negligently will result in more truthful expert testimony. Without some overarching purpose, it would be illogical, if not unconscionable, to shield a professional, who is otherwise held to the standards and duties of his or her profession, from liability for his or her malpractice simply because a party to a judicial proceeding has engaged that professional to provide services in relation to the judicial proceeding and that professional testifies by affidavit or deposition. In this case, cross-examination during the deposition succeeded in revealing excesses or inaccuracies in defendant Howard's opinion testimony. The truth-finding function of the judicial system was thus protected. Though defendant Howard contends he is effectively being punished for telling the truth, i.e., confessing to his errors, we see no valid reason why the judicial system should immunize him from liability to his client for his alleged negligence in making calculations and formulating his opinion.[22]
Finally, we see no merit to the argument that witness immunity should apply to expert witnesses because it will otherwise be difficult for the expert's client to prove causation and damages in a suit brought by the client against the expert. Simply because the plaintiff client may have a heavy burden to carry in proving his case does not mean that we should immunize the defendant retained expert from civil liability for his professional negligence or breach of contract.
We therefore answer the question certified to us in the negative: Witness immunity or privilege in Louisiana does not bar a claim against a retained expert witness asserted by a party who in prior litigation retained the expert, which claim arises from the expert's allegedly negligent performance of his agreed upon duties to provide litigation support services.

DECREE
We answer the certified question as set forth in this opinion. Pursuant to Rule XII, Supreme Court of Louisiana, the judgment rendered by this court upon the question certified shall be sent by the clerk of this court under its seal to the United States Court of Appeals for the Fifth Circuit and to the parties.
CERTIFIED QUESTION ANSWERED.
NOTES
[*] Retired Judge Robert L. Lobrano, assigned as Justice Pro Tempore, participating in the decision.
[1] Marrogi v. Howard, 01-1106 (La.6/13/01), 794 So.2d 778.
[2] While employed by Tulane, Dr. Marrogi, a pathologist, participated in the Faculty Practice Plan, which requires Tulane as administrators/ fiduciaries to bill and collect for the participant's professional services performed for patients at Tulane's various clinics or hospitals and then distribute to the participant a percentage of the collected money. For a summary of Dr. Marrogi's litigation against Tulane, see Marrogi v. Gerber, 00-1091 (La. App. 4 Cir. 5/16/01), 787 So.2d 1098, writ denied, 01-1768 (La.9/28/01), 798 So.2d 120.
[3] The district court's ruling was upheld on appeal. See Marrogi v. Gerber, supra.
[4] Howard also sought dismissal on the grounds that venue was improper in Louisiana and that the federal district court had no personal jurisdiction over the defendant because all of the actions complained of had transpired in the State of Florida. Alternatively, Howard sought transfer to the federal district court in Jacksonville, Florida, on the ground of forum non-conveniens.
[5] After finding that witness immunity did apply, the federal district court judge stated:

Of course, even if the plaintiff had argued that the focus of this action was the underlying preparation of the expert testimony rather than its presentation and effect on a Louisiana lawsuit, witness immunity may not be squarely presented, but this Court would lack personal jurisdiction over that action given the fact that all preparation occurred in Florida.
Marrogi v. Howard, 2000 WL 777914, * 3 n. 3 (E.D.La.2000).
[6] For an in depth discussion of advisory opinions, see Pascal F. Calogero, Jr., Advisory Opinions: A Wise Change for Louisiana and its Judiciary?, 38 Loy. L.Rev. 329 (1992).
[7] The privilege originated in the common law, more particularly the law of defamation. See Murphy v. A.A. Mathews, 841 S.W.2d 671, 674 (Mo.Sup.Ct.1992). The early Louisiana cases discussing the privilege of witness immunity rely on English common law, as revealed by their references to English treatises on slander and libel. See infra.
[8] In Terry, the defendant had testified before Congress that the plaintiff had participated in a rebellion against the United States government and had carried a flag emblazoned with a skull and crossbones, meaning no quarter to the enemy in the fight. The plaintiff later sued for libel and slander, but his suit was dismissed for no cause of action. The court affirmed. Because the defendant had uttered the words in response to interrogatories propounded to him as a witness and to which he was compelled to answer, the defendant was protected by witness immunity. 21 La.Ann. at 376-77.
[9] In Briscoe v. LaHue, 460 U.S. 325, 332-34, 103 S.Ct. 1108, 1114-15, 75 L.Ed.2d 96, 105-07 (1983), the United States Supreme Court set forth the underlying policy rationale for absolute witness immunity thusly:

In the words of one 19th-century court, in damages suits against witnesses, "the claims of the individual must yield to the dictates of public policy, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." Calkins v. Sumner, 13 Wis. 193, 197 (1860). A witness'[s] apprehension of subsequent damages liability might induce two forms of self-censorship. First, witnesses might be reluctant to come forward to testify. See Henderson v. Broomhead, [4 H. & N. 569, 578-79, 157 Eng. Rep. 964, 968 (Ex. 1859)]. And once a witness is on the stand, his testimony might be distorted by the fear of subsequent liability. See Barnes v. McCrate, 32 Me. 442, 446-47 (1851). Even within the constraints of the witness'[s] oath there may be various ways to give an account or to state an opinion. These alternatives may be more or less detailed and may differ in emphasis and certainty. A witness who knows that he might be forced to defend a subsequent lawsuit, and perhaps to pay damages, might be inclined to shade his testimony in favor of the potential plaintiff, to magnify uncertainties, and thus to deprive the finder of fact of candid, objective, and undistorted evidence. See Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum. L.Rev. 463, 470 (1909). But the truthfinding process is better served if the witness'[s] testimony is submitted to "the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies." Imbler v. Pachtman, 424 U.S. 409, 440, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (White, J., concurring in judgment).
[10] Reprinted in Thomas Starkie and John L. Wendell, A Treatise on the Law of Slander and Libel, and Incidentally of Malicious Prosecutions (Steam Power Press, Massachusetts 1852)(with notes and references to American cases and to English decisions since 1830).
[11] In Oakes, the plaintiff had unsuccessfully sued a baking company and its employee for injuries inflicted upon the plaintiff by the employee. The baking company's law firm had hired a physician to examine the plaintiff. After examining the plaintiff, the physician sent a letter to the law firm in which he opined that the plaintiff was mentally "abnormal" and "undeveloped." The physician testified in court that he had written the letter and he then read the letter in open court. The plaintiff sued the physician for slander. The court first found that the physician enjoyed a qualified privilege for the letter, because it was a communication made in good faith, upon subject matter in which the physician had an interest, or in reference to which he had a duty, either legal, moral, or social, and it was made to a person having a corresponding interest or duty. 154 So. at 27, 179 La. at 370. The court then turned to the physician's in-court testimony and reasoned that the testimony was presumptively privileged under the rule of witness immunity and that the plaintiff, to overcome the presumption, was required to show that the physician's testimony was not "pertinent and material to the issue." 154 So. at 28, 179 La. at 370.
[12] The expert witness testified that the cracks in the plaintiff's home had been caused by settling and not by the defendant's seismic exploration activities and that the cracks had existed when the house was painted prior to the seismographic operations. 368 So.2d at 1136.
[13] The distinction between the immunity granted to witnesses and the immunity granted to litigants was pointed out in Lescale v. Joseph Schwartz Co., Ltd., 116 La. 293, 40 So. 708 (1905). The court explained that the privilege of a witness is an entirely different matter from the privilege of a litigant. "Obvious considerations lead to the protection of a witness, especially a non-volunteer witness, that have no application in the case of a mere litigant prosecuting, or defending, his private right." 40 So. at 711. The court in Lescale held that a litigant who without probable cause makes defamatory allegations against his adversary knowing them to be false commits a fault within the meaning of La. Civ. Code art. 2315, providing that every act whatever of man that causes injury to another obliges him by whose fault it happened to repair. Lescale held that a litigant cannot escape liability on the score of the allegations having been material to the issue.
[14] See also Rogers v. Janzen, 711 F.Supp. 306 (E.D.La.1989).
[15] See, e.g., Randall K. Hanson, Witness Immunity Under Attack: Disarming "Hired Guns," 31 Wake Forest L.Rev. 497 (1996); Douglas R. Richmond, The Emerging Theory of Expert Witness Malpractice, 22 Cap. U.L.Rev. 693 (1993); Eric G. Jensen, Comment, When "Hired Guns" Backfire: The Witness Immunity Doctrine and the Negligent Expert Witness, 62 UMKC L.Rev. 185 (1993); Douglas Pahl, Note, Absolute Immunity for the Negligent Expert Witness: Bruce v. Byrne Stevens, 26 Willamette L.Rev. 1051 (1990); Leslie R. Masterson, Comment, Witness Immunity or Malpractice Liability for Professionals Hired as Experts?, 17 Rev. Litig. 393 (1998); Mark Hansen, Experts are Liable, Too: Client Suits Against "Friendly Experts" Multiplying, Succeeding, 86 A.B.A. J. 17 (Nov. 2000); but see Adam J. Myers, III, Misapplication of the Attorney Malpractice Paradigm to Litigation Services: "Suit Within a Suit" Shortcomings Compel Witness Immunity for Experts, 25 Pepp. L.Rev. 1 (1997).
[16] See Pollock v. Panjabi, 47 Conn.Supp. 179, 27 Conn. L. Rptr. 316, 781 A.2d 518 (2000); LLMD of Michigan, Inc. v. Jackson-Cross Co., 559 Pa. 297, 740 A.2d 186 (1999); Murphy v. A.A. Mathews, 841 S.W.2d 671 (Mo.Sup.Ct. 1992); Mattco Forge v. Arthur Young & Co., 5 Cal.App.4th 392, 6 Cal.Rptr.2d 781 (1992); James v. Brown, 637 S.W.2d 914 (Tex.Sup.Ct. 1982); Levine v. Wiss & Co., 97 N.J. 242, 478 A.2d 397 (1984); but see Bruce v. Byrne Stevens & Associates Engineers, Inc., 113 Wash.2d 123, 776 P.2d 666 (1989).
[17] Defendant Howard relies on Genovese v. Usner, 602 So.2d 1084 (La.App. 1st Cir.1992); S.T.J. v. P.M., supra; Moity v. Busch, supra, and Rogers v. Janzen, supra. As discussed previously, Moity involved suit against an adverse expert witness, while S.T.J. and Rogers involved suits against court-appointed experts. Genovese is somewhat different, in that the plaintiff sued his former social worker/marriage counselor for breach of a statutory privilege for communications between social workers and their clients, set forth in La.Rev.Stat. 37:2714, when the social worker was ordered to testify in court by the trial judge in a hearing to determine fault in a separation proceeding. In dismissing the suit against the social worker with prejudice, the court reasoned that the social worker did not unlawfully breach the statutory privilege, because the social worker would have been found in contempt had he refused without proper cause the trial judge's order to testify, even though that order was later deemed erroneous. Notably, the Genovese court did not base its holding on the application of witness immunity.
[18] In addition, the Washington Supreme Court gave no weight to the fact that the expert is retained and compensated by a party, rather than appointed by the court, because "[t]he basic policy of ensuring frank and objective testimony obtains regardless of how the witness comes to court." 776 P.2d at 669. The court stated that, "as a matter of law the expert serves the court," because the admissibility and scope of the expert's testimony is within the court's discretion and its admissibility turns on whether the testimony will be of assistance to the fact-finder. Id. Lastly, the court rejected the contention that witness immunity is restricted to defamation cases, reasoning that the chilling effect of the threat of subsequent litigation was the same regardless of the theory on which the subsequent litigation is based. Id.
[19] The Pennsylvania Supreme Court majority in LLMD of Michigan cautioned that its holding has limited application. "An expert witness may not be held liable merely because his or her opinion is challenged by another expert or authoritative source. In those circumstances, the judicial process is enhanced by the presentation of different views. Differences of opinion will not suffice to establish liability of an expert witness for professional negligence." LLMD of Michigan, 559 Pa. at 307, 740 A.2d at 191.
[20] At least some professional organizations have begun to set guidelines for providing litigation consulting services. See Myers, supra, 25 Pepp. L.Rev. at 3 n. 7.
[21] The concern that all but full-time experts will be driven from the courtroom is unrealistic. We have no doubt either that appropriate hold-harmless agreements can protect one-time experts seeking such protection or that the insurance industry can meet the needs of experts, whether full-time or not, for errors and omissions coverage.
[22] Defendant Howard's assertion that he admitted to his errors is perhaps more properly directed to an argument that Dr. Marrogi could have mitigated any damages. In fact, Dr. Marrogi apparently did engage other professionals to review at least some of the medical records in question in his unsuccessful attempts to oppose Tulane's motion for summary judgment and to obtain a new trial. See Marrogi v. Gerber, supra.