JUDE G. GRAVOIS, Judge.
| sDefendants/appellants, David J. Luki-novich (“Mr. Lukinovich”) and David J. Lukinovich (A Professional Corporation) (collectively, “defendants”), appeal a trial court judgment that found Mr. Lukinovich breached his fiduciary duties to his former clients, Harold E. Molaison (“Mr. Molai-son”) and David C. Loeb (“Mr. Loeb”) (collectively, “plaintiffs”) by submitting to an interview with the IRS criminal division’s special agent and by testifying in front of a federal grand jury, both pursuant to subpoenas. Plaintiffs alleged that Mr. Lukinovieh’s testimony before the grand jury resulted in their indictments for criminal tax evasion and conspiracy to commit tax evasion. After plaintiffs were acquitted in a jury trial, and after the government’s subsequent unsuccessful civil action against plaintiffs for tax evasion was completed, plaintiffs sued defendants for damages, arguing that defendants were liable to plaintiffs for damages resulting from plaintiffs’ indictments.
14A bench trial in this matter occurred over the course of two calendar years, on April 26-28, June 13-16, and November 28-December 1, 2011, and on March 19-23, and April 16-18, 2012. Judgment was rendered on December 3, 2012, finding defendants liable to plaintiffs and awarding each of them damages.[1]
On appeal, defendants raise the following assignments of error:
I. The trial court erred in failing to find that Mr. Lukinovich was absolutely immune from liability arising out of his IRS interview and federal grand jury testimony.
II. The trial court erred in failing to find that plaintiffs’ claims against Mr. Lukinovich are perempted.
III. The trial court erred in failing to find that plaintiffs’ claims are speculative and that they failed to satisfy their burden of proof (assuming they even have claims).
IV. The trial court erred in failing to find that plaintiffs’ claims were barred by their unclean hands as a result of their acquisition of an interest in the subject matter of the taking cases and/or misrepresentations made to their tax advisors and the IRS.
V. The trial court erred in its allocation of fault.
*344 VI. The trial court erred in its award of damages for attorneys’ fees, mental anguish, and lost income.
VIL The trial court erred in admitting the expert testimony of Messrs. Riess, Ciolino, Tizzard, and Re-bowe.
After thorough consideration of this extensive record and the applicable law, we find merit to defendants’ first assignment of error, and thus, for the following reasons, find that as a fact witness before the federal grand jury, Mr. Lukinovich enjoyed absolute immunity from civil suit for damages by plaintiffs, the target of the grand jury’s investigation, based on any testimony Mr. Lukinovich gave before the grand jury and in the IRS interview, the admitted bases for their suit against defendants. Accordingly, we reverse the judgment of the trial court under review and render judgment dismissing plaintiffs’ suit with prejudice at plaintiffs’ costs.

J¿'ACTS AND PROCEDURAL HISTORY

Mr. Lukinovich was retained by plaintiffs in 1996 to advise them in connection with their 1996 and 1997 income tax returns relative to the tax treatment of monies plaintiffs received from representing a group of landowners in what was known as the “Bayou aux Carpes” takings litigation. After successfully settling the case with the federal government for approximately $8.25 million, plaintiffs collectively received approximately $2 million in compensation for representing the landowners.
A mutual friend recommended Mr. Luk-inovich, a board certified tax attorney, to plaintiffs, who asked him to prepare a proposal directed to their landowner-clients offering his services in assisting them with their income tax returns, and specifically regarding the tax treatment of their proceeds from the takings litigation. Mr. Lukinovich was retained by one landowner, Mrs. Pat Morrow, to assist her in preparing her 1996 tax returns. He advised her that as a landowner whose land was subject to an involuntary taking by the government, she could use the “Section 1033” election, a provision of the tax code that allows such landowners the ability to defer taxes on the proceeds of the sale in the takings litigation if the proceeds were “rolled over” into another qualifying piece of real property within a certain time frame.
In July of 1996, plaintiffs asked Mr. Lukinovich if they, too, could use the Section 1033 election to defer the taxes on the fees they earned in the takings litigation. Plaintiffs gave Mr. Lukinovich copies of their representation contracts with the landowners, which he opined looked like standard contingency fee contracts. Mr. Lukinovich researched the matter and memorialized his research in a letter to plaintiffs dated August 21, 1996 (hereinafter, the “hurdles” letter), advising plaintiffs that it did not appear to him, based on the contingency fee | (¡contracts, that they had the requisite ownership interest in the land to take the Section 1033 election. He identified two hurdles that needed to be overcome: first, the law partnership Mr. Molaison and Mr. Loeb were supposedly operating under at the time appeared to be the contracting party in some of the representation contracts, rather than plaintiffs individually, and second, the contracts as written were contingency fee contracts that did not support the conclusion that plaintiffs had an ownership interest in and to the land itself.
The parties met on September 4,1996 to discuss the matter further. Present were Mr. Lukinovich, Mr. Molaison, Mr. Loeb, Gerald Duhon (Mr. Loeb’s longtime CPA) and Shannon Chabaud (Mr. Molaison’s CPA). At that meeting, plaintiffs advised *345 Mr. Lukinovich that neither issue contained in the hurdles letter would be an obstacle to their taking the Section 1033 election. They advised Mr. Lukinovich that they as individuals, not the law partnership, had entered into the representation. They also advised Mr. Lukinovich that the landowners had indeed transferred an undivided 25% ownership interest in and to the land itself to them at the time they agreed to hire plaintiffs to represent them in 1991; however, such language was “inadvertently omitted” from the contingency fee contracts due to the need for haste to execute the contracts.[2] Mr. Lukinovich stated that plaintiffs would need a “writing” to clarify the owners’ intent to transfer an ownership interest in and to the land itself to them, so that they could support their position to the IRS.
As recalled by Mr. Lukinovich and Mr. Duhon, at that meeting, it was agreed that Mr. Loeb, with input from Mr. Lukinovich, would draft the “writing” |7for the landowners to sign. Mr. Loeb proposed entitling it an “act of correction,” according to Mr. Lukinovich, who stated that he had not heard that term before. Mr. Molaison and Mr. Loeb would be responsible for getting the landowners to execute the acts of correction, as well as recording them in the public records, a step that Mr. Lukino-vich recommended. Mr. Lukinovich also recommended recording the original contingency fee contracts as well.[3] A few hours after the meeting, Mr: Loeb faxed Mr. Lukinovich a draft of an act of correction. Mr. Lukinovich reviewed the draft and recommended making one change regarding the words “contingency fee contract,” which Mr. Loeb subsequently made. Thereafter, Mr. Lukinovich did not provide any other edits to the act of correction.
One of the landowners, Mrs. Pat Morrow, who as noted had hired Mr. Lukino-vich to prepare her 1996 tax returns, called Mr. Lukinovich to ask him if she would have any personal tax consequences if she signed the act of correction which had been presented to her by plaintiffs for her signature. Her brother, Jacques Creppel, also a landowner, had the same question. Mr. Lukinovich advised them that they would not have any personal tax consequences to their own tax returns by signing the acts of correction as requested by Mr. Loeb and Mr. Molaison. Mrs. Morrow and Mr. Creppel did not ask Mr. Lukinovich any other questions about the acts of correction. No other landowners contacted Mr. Lukinovich to ask questions about the acts of correction.
In late 1999, the IRS notified plaintiffs that it would be conducting audits of their 1996 and 1997 federal income tax returns.
*346 It appears that the audits were initiated in part by repeated complaints made to the IRS by the Goldmans, a group Rof landowners who told the IRS that the acts of correction plaintiffs asked them to sign were incorrect in that the parties thereto never intended that an ownership interest in and to the land would be transferred to plaintiffs as compensation for representing them in the takings litigation; the payment was to be made in money, not land.[4] The audits occurred separately: Mr. Loeb’s was done first in January of 2000; Mr. Molaison’s followed a few months later. Mr. Lukinovich represented plaintiffs before the IRS in the audits.
The audits resulted in the denial of deferral of taxes on Mr. Loeb’s and Mr. Molaison’s fees in the takings litigation. Thereafter, the Criminal Investigation Division of the IRS commenced a criminal investigation into Mr. Loeb’s and Mr. Mo-laison’s tax returns. Special Agent Craig Knippenberg of the IRS interviewed many witnesses, including the aforementioned accountants and many of the landowners, and questioned them regarding the contingency fee contracts and the acts of correction. By now, plaintiffs and Mr. Lukinovich had engaged their own separate criminal counsel. Mr. Lukinovich was issued a summons by the IRS, to which he responded by invoking the attorney-client privilege and producing redacted documents. Agent Knippenberg then told Mr. Lukinovich that he was considering referring Mr. Lukinovich for indictment for aiding and abetting plaintiffs in their conspiracy to commit tax evasion. Agent Knippenberg summoned Mr. Luki-novich to submit to an interview in 2003. Mr. Lukinovich advised plaintiffs, through letters to their criminal counsel, that in order to defend himself to the IRS, he might have to divulge matters covered by the attorney-client privilege. Plaintiffs’ counsel asked Agent Knippenberg that they be allowed to attend Mr. Lukino-vich’s interview “to protect work-product and attorney-client 19privilege issues.... ” Agent Knippenberg refused this request.[5] Plaintiffs took no further action to stop Mr. Lukinovich’s interview with Agent Knippenberg. Mr. Lukinovich’s interview with Agent Knippenberg was memorialized in a “memorandum of interview” prepared by Agent Knippenberg.
A grand jury was convened, which collected evidence, including the memoranda of interviews taken by the IRS as noted above, and subpoenaed multiple witnesses to testify. Mr. Lukinovich was subpoenaed to testify before the grand jury in 2004.[6] Mr. Molaison and Mr. Loeb then moved to quash or limit the scope of Mr. Lukinovich’s subpoena. The federal district court conducted an evidentiary hearing on the matter and issued a written ruling denying the motion to quash. In so doing, the court found the issue to be whether the government could use privileged communications exchanged by and between defendants (Mr. Loeb and Mr. Molaison), their attorney (Mr. Lukinovich), and their accountants in presenting the *347 case to the grand jury. The court found that the attorney-client privilege was not absolute and was subject to the crime-fraud exception, which holds that clients are not entitled to the privilege to protect communications made to their attorneys in contemplation or furtherance of a crime or fraud. The court examined the government’s basis for a showing of probable cause to believe that plaintiffs attempted to or did commit a crime and whether the communications to Mr. Lukinovich and the accountants were in furtherance of such crime or fraud. In so doing, the court closely examined the affidavit of Agent Knippenberg submitted by the government in its opposition to the motion to quash. The affidavit was a compilation of the evidence gathered by Agent Knippen-berg against plaintiffs |inthrough the IRS interviews. The court excluded from its consideration of probable cause those paragraphs of the affidavit that contained facts obtained by Agent Knippenberg’s 2003 interview with Mr. Lukinovich, because the court specifically declined to condone “the coercive manner in which the information was obtained under threat of indictment of the attorney who properly asserted the attorney-client privilege on behalf of his clients.” Examining only the non-privileged information contained in the affidavit (evidence that came from other sources, including the landowners’ interviews with the IRS), the court found that the evidence presented by the government established a prima, facie case that plaintiffs sought legal advice from Mr. Lukino-vich in order to further a conspiracy to evade taxes. Therefore, it concluded that the crime-fraud exception applied to the privileged communications, declared that the privilege no longer existed between plaintiffs’ and Mr. Lukinovieh’s communications, and denied the motion to quash. Afterwards, Mr. Lukinovich testified before the grand jury in June of 2004.
Ultimately, on July 29, 2004, plaintiffs were indicted for criminal tax evasion and fraud; they were later acquitted following a jury trial. The government also filed a civil action against plaintiffs in U.S. Tax Court for tax evasion; plaintiffs were found not liable in said action. Thereafter, plaintiffs sued Mr. Lukinovich in this suit, arguing that his interview with the IRS and his testimony before the federal grand jury violated his fiduciary duties to his former clients and resulted in their indictments.
The trial court found in the instant case, in its judgment, that Mr. Lukinovich breached the fiduciary duties of care and loyalty owed to plaintiffs during his interview with representatives from the IRS and during his grand jury testimony in both the civil and criminal proceedings brought by the government against plaintiffs. The trial court specifically found that Mr. Lukinovich’s failure to_J_y defend the tax strategy that he, as plaintiffs’ tax expert, had previously recommended and “defendant’s lack of forthcoming testimony” to the grand jury were a breach of his fiduciary duties.

FIRST ASSIGNMENT OF ERROR— witness immunity

[7]

In their first assignment of error on appeal, defendants argue that as a fact *348 witness who was subpoenaed to testify before a grand jury, Mr. Lukinovich enjoyed absolute immunity from civil suit arising from his testimony, citing Rehberg v. Paulk, — U.S. —, 132 S.Ct. 1497, 182 L.Ed.2d 593 (2012), and cases cited therein, and Lauga v. McDougall, 463 So.2d 754 (La.App. 4th Cir.1985). Accordingly, they argue, that Mr. Lukinovich is immune from suit stemming from his interview with the IRS in 2003, and from his grand jury testimony in 2004, and as such, plaintiffs have no cause of action against him.
Plaintiffs, on the other hand, argue that the exception to the rule of witness immunity carved out by the Louisiana Supreme Court in Marrogi v. Howard, 01-1106 (La.1/15/02), 805 So.2d 1118, applies in this case, because Mr. Lukinovich was hired by plaintiffs as an expert witness, an expert in tax law.
In Rehberg v. Paulk, supra, the United States Supreme Court held that a grand jury witness was entitled to absolute immunity from claims made against him in a Section 1983 action by the grand jury target who was indicted by the grand jury, the same absolute immunity afforded to witnesses at trial. In so doing, the high court noted that: “Grand juries, by tradition, statute, and sometimes constitutional mandate, have a status and entitlement to information that absolute | ^immunity furthers.” [8] The court held that such absolute immunity is critical to the functioning of the grand jury system, the importance of which system “cannot be underestimated.” [9]
In Lauga v. McDougall, supra, the Louisiana Fourth Circuit Court of Appeal held that a non-party witness who testified (allegedly falsely) against the plaintiffs in grand jury proceedings and at two trials (wherein the plaintiffs were ultimately acquitted) was nonetheless entitled to absolute immunity in a defamation action brought against him by the plaintiffs.
The Marrogi court did not consider the testimony of a witness subpoenaed to testify in front of a grand jury. There, the Louisiana Supreme Court was called upon specifically to decide whether:
Under Louisiana law, does witness immunity bar a claim against a retained expert witness, asserted by a party who in prior litigation retained that expert, which claim arises from the expert’s allegedly deficient performance of his duties to provide litigation services, such as the formulation of opinions and recommendations, and to give opinion testimony before or during trial?
Marrogi, 805 So.2d at 1120.
In answering this question in the negative, our high court recognized that the privilege of witness immunity was itself an exception to general tort liability. The court traced the development of the exception to tort liability of witness immunity in Louisiana in order to discern the underlying policy reasons that gave birth to the privilege. The court found that an important policy behind the immunity was “so that witnesses, bound by their oaths to tell the truth, may speak freely without fear of civil suits for damages” provided that the “testimony given by a non-party witness in a judicial proceeding ... is pertinent and material to the issue.” Id. at 1124-1125. The court then concluded that these policy reasons “do not justify | ^protecting a retained expert from malpractice liability in this case where the expert was hired to assist his client in a judicial proceeding by *349 reviewing medical billing reports and making certain calculations, but made errors in performing these services.” IcL at 1124. As the court stated:
In Louisiana, the affirmative defense of witness immunity or privilege has evolved from the jurisprudence. Since the 1800s, this court has recognized the rule that, at least in the context of defamation suits against adverse witnesses, immunity from a civil action attaches to a witness in judicial or quasi-judicial proceedings. Oakes v. Walther, 179 La. 365, 154 So. 26, 27 (1934); Burke v. Ryan, 36 La.Ann. 951 (1884); Terry v. Fellows, 21 La.Ann. 375 (1869). The policy basis for this rule has been explained as follows: “The administration of justice requires the testimony of witnesses to be unrestrained by liability to vexatious litigation. The words they utter are protected by the occasion, and cannot be the foundation for an action for slander.” Terry v. Fellows, 21 La.Ann. at 376. More recently, in Knapper v. Connick, 96-0434, p. 3 (La.10/15/96), 681 So.2d 944, 946, we stated that “communications made in judicial or quasi-judicial proceedings carry an absolute privilege so that witnesses, bound by their oaths to tell the truth, may speak freely without fear of civil suits for damages.”
The court in the 1869 Louisiana Supreme Court decision, Terry v. Fellows, further explained that “[witnesses, like jurors, appear in court in obedience to the authority of the law, and therefore may be considered as well as jurors to be acting in the discharge of a public duty, and though [they are liable to prosecution for perjury or for conspiracy to give false testimony], they are not responsible in a civil action for any reflections thrown out in delivering their testimony.” 21 La.Ann. at 376-77, quoting Thomas Starkie, A Treatise on the Law of Slander and Libel, and Incidentally of Malicious Prosecutions, vol. II, p. 242 (2d English Ed. 1830) hereinafter Starkie on Slander. The court stated that “an action of slander does not lie for anything said or done in the course of a judicial proceeding.” 21 La.Ann. at 377, citing Starkie on Slander, vol. II, p. 254.
In general, witness immunity is an “absolute privilege” because the privilege protects the witness from civil suit regardless of malice or falsity. See Burke v. Ryan, 36 La.Ann. at 951-52; see also Lauga v. McDougall, 463 So.2d 754 (La.App. 4th Cir.1985) (police officer who testified against the plaintiff at grand jury proceedings and trials was absolutely immune from prosecution for a defamation action even if his testimony were false). At English common law, absolute witness immunity required no showing that the allegedly defamatory statements were relevant to the proceeding. See Briscoe v. LaHue, 460 U.S. 325, 331 n. 11, 103 S.Ct. 1108, 1113 n. 11, 75 L.Ed.2d 96, 104 n. 11 (1983). In Louisiana, the rule of witness immunity is 114somewhat narrower, to the extent that the witness’s declarations “cannot serve as the foundation for a civil suit when they are pertinent and material.” Oakes v. Walther, 154 So. at 27, citing Burke v. Ryan, supra.
In Burke v. Ryan, the plaintiff sued the defendants, who had, under threat of subpoena, signed affidavits in an earlier case to the effect that the plaintiff had a poor reputation for truth and veracity. These affidavits, procured by an attorney representing a criminal defendant in the earlier case in which the plaintiff had apparently testified, were filed in support of a motion for new trial in that case based on newly discovered evidence. In reversing the jury’s award *350 for the plaintiff in the subsequent libel case, the court stated:
It needs no elaborate reference to authorities to establish the proposition of law; that as witnesses, who appear in a court of justice, discharge a public duty; that, though they be liable to a prosecution for perjury, should they commit such, they are not responsible, in a civil action, for any reflection thrown out in delivering their testimony, or for anything said or published by them in the course of a judicial proceeding, even if the statement be false, malicious and without probable cause. There is put this qualification, however: that statements thus made, in the course of an action, must be pertinent and material to the issue.
[[Image here]]
The authorities are also to the effect that every affidavit sworn to in the course of a judicial proceeding in a court of competent jurisdiction is absolutely privileged and no action lies therefor, however false and malicious may be the statement therein contained.
36 La.Ann. at 951-52 (citations omitted). The court in Burke v. Ryan reasoned that the affidavits were legal evidence and that they were applicable, pertinent, and material to the issue raised by the motion for new trial. Accordingly, the affidavits were protected communications, and the affiants were absolutely immune from civil liability.
In short, our courts have long recognized the general rule that there is absolute immunity from civil liability for testimony given by a non-party witness in a judicial proceeding, so long as that testimony is pertinent and material to the issue. See Oakes, supra. Thus, as in a number of other American jurisdictions, once the threshold showing is made that the allegedly defamatory statements were relevant to the judicial proceeding, the privilege of absolute immunity protects the witness from civil liability regardless of malice or falsity. See Briscoe v. LaHue, 460 U.S. at 331 n. 11, 103 S.Ct. at 1113 n. 11; see also Murphy v. A.A. Mathews, 841 S.W.2d 671, 675-77 (Mo.Sup.Ct.1992).
| vJd. at 1124-1126, footnotes omitted.
As noted therein, Mr. Howard was hired by Dr. Marrogi as an expert witness to assist Dr. Marrogi in preparing his case against Tulane Hospital for breach of contract and damages. Mr. Howard was to provide litigation support services, which services included analyzing records, preparing a report containing his calculations of plaintiffs damages, and providing testimony about his conclusions both before and during trial. Mr. Howard’s report contained numerous errors in calculations, which were pointed out by Tulane in pretrial proceedings, and which Mr. Howard did not rectify. Additionally, Mr. Howard terminated his own deposition at which his other mistakes were noted, and terminated his employment with Dr. Marrogi before providing all of the services for which he had been paid. After Dr. Marrogi sued Mr. Howard for breach of contract and professional malpractice, which Dr. Marro-gi alleged resulted in the dismissal of his case against Tulane, Mr. Howard filed an exception of no cause of action, attempting to cloak the deficient performance of his contractual duties to Dr. Marrogi under the exception of witness immunity to civil suit. The supreme court found, however, that the policy considerations behind witness immunity were not furthered by extending that immunity to a suit against a “friendly” expert witness hired to formulate opinions and testify regarding those opinions, when that expert witness breaches his contractual duties to the plaintiff to provide those very services, only part of *351 which was to testify regarding those opinions.
The facts in the instant case are starkly distinguishable from those in Marrogi and clearly implicate the policy considerations stated in Marrogi favoring witness immunity. While Mr. Lukinovich was hired by plaintiffs to assist them in preparing their tax returns because of his expertise in tax law, he was not hired by plaintiffs as an “expert witness” as that term is defined and understood by |1fiLouisiana Code of Evidence art. 702, et seq.,[10] and Marrogi. Mr. Lukinovich, a non-party, was subpoenaed to testify before the grand jury as a fact witness. His testimony was pertinent and material to the issue the grand jury was investigating. Thus, the exception of witness immunity applies, and applies regardless of any alleged malice or falsity in Mr. Lukinovich’s testimony, as noted in Lauga, supra.[11]
The fact that Mr. Lukinovich had previously been retained by plaintiffs to provide professional services, or that he answered a hypothetical question posed to him by the grand jury, does not make him a “retained expert witness” before the grand jury as per the rules of evidence or Marrogi. No person, not even the target of a grand jury investigation, has the right to call any witnesses, expert or fact, to testify in front of a grand jury. “Prospective indictees may not, as a matter of constitutional right, attend the proceeding personally or through counsel, cross-examine witnesses, introduce evidence or compel the introduction of exculpatory evidence at the proceeding.” U.S. v. Tallant, N.D.Ga.1975, 407 F.Supp. 878, 883. Thus, Mr. Lukinovich could not and did not appear before the grand jury as plaintiffs’ advocate.
A witness has a duty to testify if called before the grand jury, conditioned only upon his privilege against self-incrimination. In re Grand Jury Subpoenas, 387 So.2d 1140, 1142 (La.1980), citing United States v. Mandujano, 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976). As a witness, Mr. Lukinovich’s only duty before the grand jury was to answer the questions posed by the grand jury 117truthfully. As the Court stated U.S. v. Sells Engineering, Inc., 463 U.S. 418, 423-424, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983):
The grand jury has always occupied a high place as an instrument of justice in our system of criminal law — so much so that it is enshrined in the Constitution. Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 399, 79 S.Ct. 1237, 1240, 3 L.Ed.2d 1323 (1959); Costello v. United States, 350 U.S. 359, 361-362, 76 S.Ct. 406, 407-408, 100 L.Ed. 397 (1956). It serves the “dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions.” Branzburg v. Hayes, 408 U.S. 665, 686-687, 92 S.Ct. 2646, 2659, 33 L.Ed.2d 626 (1972) (footnote omitted). It has always been extended extraordinary powers of *352 investigation and great responsibility for directing its own efforts:
“Traditionally the grand jury has been accorded wide latitude to inquire into violations of criminal law. No judge presides to monitor its proceedings. It deliberates in secret and may determine alone the course of its inquiry. The grand jury may compel the production of evidence or the testimony of witnesses as it considers appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials. ‘It is a grand inquest, a body with powers of investigation and inquisition, the scope of whose inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found properly subject to an accusation of crime.’” United States v. Calandra, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974), quoting Blair v. United States, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919).
These broad powers are necessary to permit the grand jury to carry out both parts of its dual function. Without thorough and effective investigation, the grand jury would be unable either to ferret out crimes deserving of prosecution, or to screen out charges not warranting prosecution. Branzburg, 408 U.S. at 688, 92 S.Ct. at 2660; Calandra, 414 U.S. at 343, 94 S.Ct. at 617. See also United States v. Dionisio, 410 U.S. 1, 12-13, 93 S.Ct. 764, 770-771, 35 L.Ed.2d 67 (1973); United States v. Johnson, 319 U.S. 503, 510-512, 63 S.Ct. 1233, 1236-1237, 87 L.Ed. 1546 (1943); Hale v. Henkel, 201 U.S. 43, 59-66, 26 S.Ct. 370, 372-375, 50 L.Ed. 652 (1906).
As noted, the rules of evidence that apply to trials do not apply in grand jury proceedings. Fed.R.Evid. 1101(d)(2); La. C.E. art. 1101(C)(6); United States v. McKenzie, 678 F.2d 629, 632 (5th Cir.1982). Expert witnesses are a construct of the rules of evidence. Marrogi’s holding, declining to extend witness immunity to |,¡¡hired expert witnesses when sued by the party who hired them for negligence in performance of their contractual duties, does not apply to a fact witness subpoenaed to testify before a grand jury, notwithstanding the fact that plaintiffs had once employed Mr. Lukinovich because of his expertise in a particular field.[12]
The same reasoning applies to find Mr. Lukinovich immune from civil suit as a result of his interview before the IRS in 2003. This interview was a quasi-judicial proceeding that invokes the same policy considerations, witness candor freed from the threat of retaliatory litigation, that provide absolute immunity to witnesses testifying before a grand jury and at trial. In any event, in declining to quash Mr. Lukinovich’s grand jury subpoena, the federal district court omitted from its consideration information given by Mr. Lukino-vich to Agent Knippenberg at his 2003 interview when determining whether the government had shown the requisite probable cause to believe that a crime had been committed. In other words, the court found the requisite probable cause to believe that a crime had been committed without considering Mr. Lukinovich’s IRS interview testimony.
Accordingly, finding merit to defendants’ first assignment of error, we hold *353 that Mr. Lukinovich is absolutely immune from suit by plaintiffs stemming from his 2003 interview with the IRS and his 2004 grand jury testimony, plaintiffs’ admitted bases for their suit against defendants. Because the trial court committed clear legal error in its decision on this issue, although harsh, we are constrained to reverse the judgment of the trial court under review and render judgment dismissing plaintiffs’ suit with prejudice at plaintiffs’ costs. Because we reverse the trial court’s judgment on our determination of this legal issue, consideration of the remaining assignments of error asserted by defendants is pretermitted.

\ ^CONCLUSION

For the foregoing reasons, the trial court judgment under review in favor of plaintiffs is hereby reversed. Plaintiffs’ suit is hereby dismissed with prejudice at plaintiffs’ costs. All costs of this appeal are taxed to appellees.

REVERSED AND RENDERED.

. The trial court awarded Mr. Molaison $2,660,641.00 in damages and awarded Mr. Loeb $2,017,917.50 in damages, together with legal interest from date of judicial demand until paid and for all costs of the proceedings.

. Mr. Loeb testified at trial that at no time did he tell Mr. Lukinovich, at this meeting or otherwise, that the landowners transferred an "ownership interest” in and to the property, but rather a "possessory interest” that was necessary to protect their fee, as the federal Court of Claims, where the Bayou aux Carpes litigation took place, does not enforce contingency fee contracts. However, Mr. Duhon, who was also present at the meeting and who also testified before the grand jury, specifically concurred with Mr. Lukinovich’s recollections regarding this issue. This issue, however, is not germane to our analysis that follows.

. Mr. Loeb testified at the trial of this matter that plaintiffs did record the original contingency fee contracts at Mr. Lukinovich's recommendation, but did not follow through on his recommendation to record the acts of correction that were signed by the landowners, because they “ran out of money.” The evidence at trial revealed that acts of correction were not in fact prepared for all of the landowners, and not all of the landowners who were presented with acts of correction agreed to sign them.

. The Goldmans also sued plaintiffs under the original contingency fee contract, disputing how the fees were calculated.

. Defendants moved for summary judgment in this case regarding the attorney-client privilege. The trial court granted defendants' motion for summary judgment after plaintiffs specifically stated that they had no objection to granting it for the limited purpose of dismissing any cause of action for breach of attorney-client privilege against Mr. Lukino-vich.

.In addition to Mr. Lukinovich, the accountants who prepared plaintiffs’ income tax returns for years in question were also summoned to the IRS and subpoenaed to the grand jury.

. Defendants raised the issue of witness immunity at several points in the litigation. This issue was first raised as an affirmative defense in defendants’ Supplemental and Amending Answer. It was next raised in defendants’ Exception of No Cause of Action, filed on February 3, 2011, which was denied without reasons. The issue was again raised by defendants in a pleading entitled "Uniform Local Rule 9.10(2)(a) List of Legal Elements” and in a memorandum in support of a motion for summary judgment filed on February 16, 2011. The motion was denied without reasons. Defendants also raised the issue in *348 their second supplemental and amending answer.

. Rehberg v. Paulk, 132 S.Ct. at 1508, n. 3.

. Id.

. Louisiana Code of Evidence art. 702, et seq., generally provide for the admissibility of testimony by expert witnesses.

. While a witness before a grand jury is absolutely immune from civil suit as a result of that testimony, regardless of any alleged falsity or malice in that testimony, a witness who testifies falsely in a court proceeding (which includes grand juries and petit juries) may be charged with the crime of perjury. La. R.S. 14:123. See also 18 U.S.C.A. § 1621. Mr. Lukinovich has not been charged with perjury as a result of his testimony before the grand jury or any testimony he has given in these and related proceedings. Because witness immunity from civil suit applies regardless of any alleged falsity or malice in the testimony, we need not reach the issue of whether Mr. Lukinovich’s grand jury testimony was "not forthcoming” as found by the trial court in die judgment.

. Plaintiffs’ petition does not allege any alleged wrongful acts committed by Mr. Luki-novich until his IRS interview in July of 2003 and his grand jury testimony in 2004. Defendants have never claimed that Mr. Lukinovich committed any legal malpractice when preparing their tax returns in 1996 and 1997 or in representing them during the audits of those returns.